# IN RE DAVONTA V.*
## (AC 26556)

Schaller, Lavine and Pellegrino, Js.

Argued June 1—officially released October 10, 2006

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*David B. Rozwaski*, for the appellant (respondent mother).

*Angela M. Offredi*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Matthew E. Naclerio*, for the minor child.

Opinion

LAVINE, J. After determining whether one of the statutory grounds for termination of parental rights under General Statutes § 17a-112 (j) exists by clear and convincing evidence, a judge is required to evaluate whether severing the legal tie between parent and child is in the child's best interest. That task is among the most sensitive and difficult with which a judge is charged. Although a judge is guided by legal principles, the ultimate decision to terminate parental rights is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript. Having engaged in that process, the trial court in this case concluded that it was in the best interest of the minor child to terminate the parental rights of the respondent mother.[1] The respondent now appeals from that judgment. It is the respondent's sole claim on appeal that the court improperly concluded that the termination of her parental rights was in the best interest of the child. We affirm the judgment of the trial court.

In its thoughtful and comprehensive memorandum of decision filed March 30, 2005, the court recited the following facts and procedural history. The child, D,

---

[1] The parental rights of the respondent father also were terminated. Only the respondent mother has appealed. We therefore refer to her in this opinion as the respondent.

born April 14, 1992, was the subject of a neglect petition filed March 9, 1999, by the petitioner, the commissioner of children and families (commissioner), alleging educational, medical and physical neglect.[2] After finding the child to be neglected, the court entered a disposition of protective supervision that allowed the respondent to have custody of the child. On August 24, 1999, protective supervision was terminated when the commissioner learned that the respondent had entered the witness protection program and relocated to North Carolina with the child. The respondent returned to Connecticut in November, 1999, and shortly thereafter the commissioner received reports of neglect concerning the child. On May 11, 2000, a neglect petition was again filed by the commissioner. An order of temporary custody was granted, stemming from the neglect petition filed in May, 2000. On October 24, 2000, the child was adjudicated neglected and committed to the care of the commissioner and placed in foster care. The commitment subsequently was maintained on August 23, 2001, and then again on September 23, 2002.

On December 12, 2002, the commissioner filed a petition for the termination of the respondent's parental rights. The petition alleged that the child was being denied proper care and attention and that the respondent had failed to achieve personal rehabilitation after the court previously had adjudicated the child neglected. On November 16, 2004, the hearing on the termination of parental rights began. Testimony was heard on a number of days over a period of several months. The court heard testimony from a child psychologist, social workers, the foster care coordinator, the child's maternal aunt and the respondent.[3]

---

[2] The respondent has two other children, J and K. K also was subject of a petition for termination of the respondent's parental rights. During the course of the termination proceeding, by agreement, the commitment of K was revoked, and custody and guardianship was given to his maternal aunt.

[3] At the time of the hearing, the respondent was incarcerated and had been since September, 2003. She was scheduled to be released in May, 2005.

On March 30, 2005, the court filed its memorandum of decision in which it found by clear and convincing evidence that the department of children and families (department) had made reasonable efforts to reunify the respondent with her child pursuant to § 17a-112 (j). The court further found by clear and convincing evidence that the respondent had "not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior to or subsequent to the date of the filing of the [petition] which would encourage the belief that within a reasonable period of time, considering the age and needs of [the child], that [the respondent] could assume a responsible position in his life" pursuant to § 17a-112 (j) (3) (B).

In the dispositional phase of the proceedings, the court considered and made the requisite factual findings pursuant to § 17a-112 (k) and determined that terminating the respondent's parental rights would be in the child's best interest. The court concluded that "the evidence is clear and convincing that the best interest of [the child] is served by termination of [the respondent's] parental rights . . . ." The respondent appealed. Additional facts will be set forth as necessary.

The respondent claims that the court improperly found, in the dispositional phase of the proceeding, that it would be in the best interest of the child to terminate the respondent's parental rights. Specifically, the respondent contends that because the child has sufficient ties to his biological family and there is not currently any guarantee of adoption, the termination was not warranted. We disagree.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is

not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003).

In the dispositional phase of a termination of parental rights hearing, "the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." *In re Romance M.*, 229 Conn. 345, 356–57, 641 A.2d 378 (1994). During this dispositional phase, "the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in § 17a-112 [k]."[4] *In*

---

[4] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered,

*re Tabitha P.*, 39 Conn. App. 353, 361–62, 664 A.2d 1168 (1995). We note that those "seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003).

In the dispositional phase of the proceedings, the court found that the seven factors listed in § 17a-112 (k) weighed in favor of terminating the respondent's parental rights, and the court thoroughly documented its conclusions regarding those factors. Those findings, which need not be repeated here, are fully supported by the record. Moreover, the court found by clear and convincing evidence that it was in the child's best interest to terminate the respondent's parental rights. The respondent does not challenge the accuracy of any of

provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

the facts on which the court relied in its ultimate finding that the factors enumerated in § 17a-112 (k) warranted termination. She also does not claim that the court excluded any evidence to the contrary. The respondent's argument is essentially a plea in avoidance. She contends that the court's finding that it is in the child's best interest to terminate her parental rights was clearly erroneous because the court failed to accord greater weight to evidence of the child's ties to his biological family and the absence of any guarantee of adoption.[5]

Although we acknowledge the respondent's desire to maintain the child's ties to his biological family members, we cannot reweigh the evidence or find facts. *In re Ashley E.*, 62 Conn. App. 307, 316, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). Deciding whether termination is in the best interest of the child is a difficult task that requires the court to weigh many different and sometimes competing interests. "The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate interests of parent, child and state require a balancing of the factors involved in those interests. . . . In every

---

[5] The respondent relies on *In re Migdalia M.*, 6 Conn. App. 194, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986), to support her argument that the child's ties to his biological family should have weighed more heavily in the determination of the child's best interest. We first note that unlike the present case, in which the respondent is challenging only the dispositional phase of the proceeding, *In re Migdalia M.* concerned an appeal from the adjudicatory phase of the trial. Second, we, as a reviewing court, cannot substitute our judgment for that of the trial court. *In re Brea B.*, supra, 75 Conn. App. 469. The wisdom of the commissioner's decision to seek termination of the respondent's parental rights in the first instance is not, of course, before this court. Nor is this court asked to decide if it would have analyzed the evidence precisely as the court did, drawn the same inferences and reached the same conclusion. We simply cannot substitute our judgment for that of the trial court. Id.

case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest, the child being the focus of the struggle." (Citation omitted.) *In re Shaquanna M.*, 61 Conn. App. 592, 598–99, 767 A.2d 155 (2001). The court's analysis of the child's best interest properly focused on the respondent's inability to provide a stable home and the child's positive and significant improvements since his placement with a foster family.[6] As we begin our analysis, we are mindful that "[o]ur function as an appellate court is to review and not retry the proceeding of the trial court." *In re Ashley E.*, supra, 62 Conn. App. 316.

The respondent has a serious and long-term history of instability stemming from drug abuse, mental illness and criminal behavior, which resulted in her incarceration. Despite numerous attempts to achieve personal rehabilitation, the respondent failed to stabilize her life. In determining whether termination of the respondent's parental rights was in the child's best interest, the court recognized that due to that instability, the respondent had "repeatedly been absent in [the child's] life for long periods," and that because of that absence the child "suffered through multiple foster home placements

---

[6] As of the time of the hearing, the foster parents had indicated that although they were willing to provide a home for D as long as he needed one, they were not presently ready to take the next step toward adoption. We note, however, that there was no evidence presented that the foster parents were opposed to the possibility of adoption in the future. We also note that our Supreme Court has stated that "[a]lthough subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated . . . it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development . . . adoption provides only one option for obtaining such stability." (Citations omitted.) *In re Eden F.*, 250 Conn. 674, 709, 741 A.2d 873 (1999). Despite foster parents' "hesitancy about committing themselves to adopting [the child, they] have indicated a willingness to provide [him] with a permanent foster home . . . . [T]he trial court reasonably could have concluded that the possibility of a permanent placement with [the child's] current foster family was preferable to the continuing uncertainty of the status quo." Id., 709–10.

[and] repeatedly experienced the disruption of potentially permanent placements." Addressing the impact that the respondent's unstable life had on the child, the court observed that the child had "struggled with issues of abandonment and feelings of rejection. He is a very adoptable child. He needs permanency, stability, consistent nurturance, appropriate discipline, and good role models. Like most every child, he wants to be part of a family. He should not and does not have to suffer the effects of uncertainty or the lack of permanency." The court also noted that the child felt secure in his current foster care family and had developed an emotional bond with it.[7] Coupled with that bond, the court concluded that the child had a strong desire to remain with his foster family and not have his home life disrupted, as it had been so often in the past.[8]

In reaching its determinations, the court relied on the testimony of various witnesses, including Barbara P. Berkowitz, a psychologist and an expert in the area of child protection, parenting and family assessment as

[7] During oral argument, the respondent emphasized the commissioner's withdrawal of her termination petition with regard to K and reasoned that D should be treated no differently. This argument ignores the fact that there was ample evidence presented to the court that demonstrated that D and K were entirely different children with different issues. As the commissioner's program supervisor, Barbara Stark, testified, "[t]hey have different needs. They have different desires and wishes. Their behaviors speak differently about them. [D] has stabilized in his placement. He has expressed his wishes, and he is very different. Hopefully, the future for him will be different with the decision for a termination versus what [K] is expressing and where [K] is at emotionally and psychologically at this point."

[8] Whatever positive feelings the child may have had toward the respondent, at the time of trial, he refused to have any contact with her. Although D expressed no opinion as to whether he wanted the respondent's parental rights to be terminated, the record reflects that he made it clear to the foster care coordinator, Jill Rusk, that he wanted "to stay in his foster home forever . . . ." The respondent suggests that sharing news of her alleged terminal illness might strengthen the weakened bonds between her and the child. The respondent, however, has failed to provide evidence of the existence of her alleged illness despite repeated requests from the commissioner.

it relates to the psychology of families. When asked her opinion regarding whether termination of the respondent's parental rights was in the child's best interest,[9] Berkowitz replied, "It's likely that that would be the case, because that would prevent a continuation of the children being in legal limbo. Because as long as [the respondent's] parental rights are still in existence, and [the child is] still in foster care, there's always the possibility of a change, so they can't really settle in. They can't really attach to somebody else, and they can still hang on to the fantasy that [the respondent's] going to come back and they're going to live happily together forever after. Whereas if [the respondent's] legal rights are severed, and they attach and they stabilize and they have some permanency and some family belongingness, and then [the respondent] does rehabilitate and is there and could be a kind of extra family resource, there could be some purpose to—if it's in their best interest—for some open adoption or open permanent foster care or contact that would be in their best interest. But otherwise, it's just continuing the psychological limbo that they live in and that they feel like no one wants them permanently."[10] Although the court heard contradictory

---

[9] The question was asked with reference to both D and K prior to the commissioner's withdrawal of the termination petition as to K.

[10] The respondent argues that prior to the termination proceeding, Berkowitz had advised against termination. The record, however, shows that Berkowitz did not in fact advise against termination, nor was she asked to make an evaluation on termination, which is illustrated by the following testimony during cross-examination by the respondent's counsel:

"Q. . . . Regarding your first evaluation done in October of 2002, did you recommend [termination of parental rights] and adoption at that time?

"A. That was not the referral issue. I recommended, in fact, it says right on page fifteen, present time, the psychologist is not aware of any termination of parental rights petition filed by [the commissioner]. So, that was not [a] referral question. This was an assessment about this placement that had just occurred and what services would be needed to facilitate this placement so that it could be either permanent foster care or long-term foster care. I also said that I would not be surprised if termination and potential for adoption might occur down the road, but at that time, that was not the referral issue.

testimony from the child's guardian ad litem, Mildred Doody, it was entitled to credit Berkowitz' testimony as more reliable. "It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Citation omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 327, 796 A.2d 516 (2002).

Finally, the court considered evidence of the child's progress, both emotionally and academically while in the care of his foster family. The court stated: "He no longer requires individual therapy, he now talks a lot about his feelings, he is doing well in school, he is in mainstream classes, and his grades are now all As and Bs." As we have stated, "[i]t is indisputable that protecting the physical and psychological well-being of children is a compelling, as well as legitimate, state interest. . . . A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens . . . . " (Citation omitted; internal quotation marks omitted.) *In re Shane P.*, 58 Conn. App. 244, 260, 754 A.2d 169 (2000). Although the termination would sever the legal ties the child had

"Q. So, that wasn't an issue for you at that time?

"A. No, it wasn't a referral issue. It's not whether it's an issue for me.

"Q. Well, on page fifteen, at that time, the appropriateness of termination [and] adoption may be easier to evaluate. That gives me the impression that you were considering it. You said [that] in the future, it would not be surprising if termination and adoption is in their best interest.

"A. That's what I just said.

"Q. But at that particular time in October of 2002, did you consider whether that would be in their best interest at that time?

"A. Well, I'm not sure that I really understand your question. I think what I said in here is pretty clear that in the future, it would not be surprising if this was what is considered. But this was not a court-ordered evaluation. There was no termination petition."

to his biological family, the court took note of the foster family's willingness to allow and to encourage the child to maintain his emotional connection to his biological family members.[11]

The court concluded that terminating the respondent's parental rights would be in the best interest of the child, as it would "allow [the child] to have closure. It would allow him to move on into either permanent foster care in his current and very supportive home with his current foster parents as his primary parents, or eventually, perhaps, give his consent for adoption." It is abundantly clear that the court gave careful consideration to the concepts of closure and permanency and did not simply use those terms as empty incantations. The court clearly relied on the testimony of the commissioner's program supervisor, Barbara Stark, who defined the term "closure" as it related to the child: "What it means is, for me and generally for children, is that they don't have to continually be worried about, am I going to be asked to do something that I don't want to do; am I going to be having to continually talk about something. . . . Well, closure means to me, and if I could use an analogy, it's sort of like a revolving door where if you're constantly bringing up issues, you're never getting out of that door and moving forward, in or out of your current situation. And for me, that means with that closure, with you shutting that

[11] In reliance on *Michaud* v. *Wawruck*, 209 Conn. 407, 413–16, 551 A.2d 738 (1988), the respondent argues that the child's ties to his biological family members should weigh heavily against termination of her parental rights. In *Michaud*, our Supreme Court acknowledged the expanding nucleus of the modern family. Although we recognize the importance of a child's ties to biological family members and do not discount the significance of connections with extended family, we cannot substitute our judgment for that of the trial court. See *In re Brea B.*, supra, 75 Conn. App. 469. Moreover, "[i]n the dispositional phase of a termination proceeding, the court properly considers only whether the parent's parental rights should be terminated, not where or with whom a child should reside following termination." *In re Sheena I.*, 63 Conn. App. 713, 726, 778 A.2d 997 (2001).

door, this child will now be able to move on and establish a good relationship with the family that he's in and move on to deal with the issues that he's had to deal with." Berkowitz also elaborated on the concepts of closure and permanency in her testimony when discussing whether terminating the respondent's rights while keeping the child's other ties to his biological family intact was just a "legal fiction." Berkowitz testified: "[W]hat the issue is, is whether or not it's in the best interest of the children to remove the possibility that they won't have permanency, because [the respondent] might come back and want revocation of commitment or they may or may not be able to be reunited with [her]. . . . . It's very distressing for children to be in a state of legal and psychological limbo and not know what's going to be happening. Where will they live next year? What about six months from now? So, it's not just a legal fiction." Although the respondent on appeal contends that she has no desire to regain custody of the child, this assertion is not supported by the record. To the contrary, the respondent testified that she was making efforts to stabilize her life in the hope of having the child returned to her at some point in the future.[12]

---

[12] The following exchange took place during trial when the respondent was questioned about her future plans to reunite with her children:

"Q. Now . . . you are not offering yourself as a placement for the children upon your release. Correct?

"A. Not right at this moment, no.

"Q. But sometime in the future, you probably would want to regain guardianship of the children. Correct?

"A. Yes.

"Q. And what do you feel you need to do in order to be suitable to be their caretakers?

"A. First of all, like I said, I go to mental health. I need mental health, because I need to—not just for medication. I need mental health, you know, because I do have a lot of issues that I need to address: Sexual abuse, drug issues, things that I feel that I have to get myself together before I can take care of my kids. I need my issues together and those are some of the issues that I need to get together before I can even get to my kids. I need to get my life together as far as my issues of my life and what happens to me and

In reviewing the court's decision, we must resist the temptation to reweigh the testimony of witnesses we have neither seen nor heard, draw inferences the court has rejected or substitute our judgment for that of the trial judge, who was closest to the evidence and was in the best position to evaluate it. See *In re Ashley E.*, supra, 62 Conn. App. 316. We acknowledge that "[p]arents have a constitutionally protected right to raise and care for their own children. . . . This right is not free from intervention by the state, however, when the continuing parens patriae interest of the state in the well being of children is deemed by law to supercede parental interests." (Citation omitted.) *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–19, 460 A.2d 1277 (1983). As our recitation and review of the evidence before the court indicates, there were ample facts on which the court could have based its finding that it was in the best interest of the child to terminate the respondent's parental rights. Mindful of our limited standard of review, we conclude that the court's decision that termination of the respondent's parental rights was in the child's best interest was not clearly erroneous.

The judgment is affirmed.

In this opinion PELLEGRINO, J., concurred.

SCHALLER, J., dissenting. "The termination of parental rights . . . is a drastic solution; it severs all ties between parent and child . . . ." *In re Bruce R.*, 234 Conn. 194, 214, 662 A.2d 107 (1995). In my view, this extreme measure was not warranted in this case. I conclude that this fourteen year old child's best interest is

the things that I didn't do when the things happened to me. I didn't get the treatment that I needed. I guess I can't really blame it on drugs, but I fell short and used drugs for that route. But I plan to get my mental health issues and my sexual abuse issues and my drug issues together before I could reunite with my kids."

*decidedly not* served by a termination of the respondent mother's parental rights despite the fact, as the trial court correctly determined, the respondent has to this point not achieved a reasonable degree of rehabilitation under General Statutes § 17a-112 (j) (3) (B). The traditional analysis that was applied in this case overlooks the most important point—that termination is inappropriate for this situation. That conclusion is borne out by the fact that the trial court did not find, by clear and convincing evidence, that termination was in the child's best interest.

The majority correctly notes that we are bound to review, not retry, the trial court's factual determinations. I wish to emphasize, however, that our authority extends to determining whether the court properly carried out its statutory duties and whether its fact-findings met the requisite standards. In particular, we are bound to review whether the trial court properly made findings by clear and convincing evidence that the child's best interest is served by termination of the respondent's parental rights. I take issue with the majority on this score. Although the majority credits the trial court with having found "by clear and convincing evidence that it was in the child's best interest to terminate the respondent's parental rights," nowhere in the court's memorandum do such findings appear. The adjudication portions of the decision are supported by facts found by clear and convincing evidence. The § 17a-112 (k) portion of the disposition consists of fact-findings by clear and convincing evidence. The crucial section of the court's memorandum of decision devoted to determining the child's best interest, a separate portion of the disposition phase, however, consists of a medley of facts drawn from other sections of the memorandum and significantly, of observations, none of them meeting the clear and convincing standard. The reason is evidence. Despite the use of traditional concepts and traditional language of parental termination cases, the

concepts and the language surely do not fit the child's situation. Ultimately, there is no clear and convincing finding of best interest because, in fact, the child's best interest is *not* served by terminating his legal relationship with the respondent. Our Supreme Court has instructed that "termination of parental rights proceedings are not designed to *punish* parents, but to *protect* children." (Emphasis in original.) *In re Samantha C.*, 268 Conn. 614, 662–63, 847 A.2d 883 (2004). In my view, by moving to terminate the respondent's parental rights, the petitioner, the commissioner of children and families, has not only failed to protect the child, but has *punished* both parent and child.

The fundamental facts concerning the child's present situation add up to a factual conclusion that his best interest will be served by maintaining his family relationship with the respondent. A result that terminates the only permanent relationship that the child is assured of, that is, with the respondent and her family, leaves him with no permanent relationships, so far as we can tell from the record in this case. At age fourteen with no likelihood of adoption even by the family that, according to some testimony, has made some sort of "long-term foster care" commitment to him, the child has everything to lose and nothing to gain by a termination of the respondent's rights. It was made crystal clear at trial and on appeal that the child has no opinion—certainly no informed opinion—on the issue of termination. He does not understand the concept; it has no meaning for him at this time. Although at the moment, he does not want to see the respondent and does want to remain in the present foster home, it is likely that his views may change in the future. Nothing in the trial court's findings or in the record suggests that he will be *expelled* from this foster family if the respondent's parental rights remain intact. On the other hand, the

child is adamant that he wants to retain his viable relationships with his brother and other maternal relatives.

The trial court accepted the arguments made by the petitioner that it was in the best interest of the child to terminate the respondent's parental rights on the basis of "closure," "permanency" and "stability." The record reveals, however, that despite the use of these *buzzwords*, which deserve no talismanic significance, termination was unnecessary and unwise. According to the trial court's findings, the child is prospering at present despite the lack of "closure," "permanency" and "stability" that has existed since he has been in the foster home. I further note that the concepts of "closure," "permanency" and "stability" were introduced by the petitioner's witnesses rather than by the child, who did not testify. Moreover, some of the petitioner's witnesses purported to offer his views through unreliable testimony. When the trial court reached the crucial issue of best interest, which must be established by clear and convincing evidence, it failed to indicate that it found best interest by that standard.

The trial court based its decision on a few facts and numerous observations that departed from the facts that it previously had found. The court noted that "he is a very adoptable child" despite its finding that there is no reason to believe that adoption will occur in this instance. The court next noted: "He is old enough to be fully cognizant of his attachment to his foster parents such that removal from their home would cause him considerable emotional harm as a result of the loss of that bond, particularly in light of the number of times that it has previously happened to him." Removal from the foster home is a *red herring* because whether the respondent's parental rights are terminated or not, he

is welcome to remain in the foster home.[1] The court next noted that, in many respects, he is doing extremely well. It is not a reason for termination that his progress has taken place while he was living with the present uncertainty. The court noted that he "won't be able to really settle in" despite the fact that he has, indeed, already done so. "He won't be able to really attach to someone else," the court noted, although he, indeed, already has. His wish to retain his blood relationships is dismissed with a note that the foster family, which has not given the only permanent commitment, adoption, is willing to allow him to maintain contact. The court further noted that "[t]here is no point in giving [the respondent] any more time to reconsider [her] lack of commitment to [the child]." Aside from the fact that this observation is relevant to the adjudicative stage, I would point out that this is not an adversary proceeding in which the petitioner should attempt to prevail over the respondent or in which the respondent should be punished—at the child's expense—for her inability to achieve rehabilitation so far.

The court then concluded that the child's best interest will be served by "freeing him from the legal relationship with [the respondent] and legalizing his status so that a family . . . can provide him with the love and care he requires." The fact is that this *liberation* will, a mere four years from reaching majority, serve to terminate permanently his legal relationship with the respondent and her blood relatives. The record reveals no reason why termination is necessary or desirable. His present positive situation, living with his foster family for the next four years, will continue with or without termination of the respondent's rights. The concepts of

---

[1] The court stated: "Although the foster parents are not willing to be an adoptive resource for [the child], they are committed to caring for him under long-term foster care. The foster parents report that he will be welcome in their home forever."

"closure" and "move on" have little relevance to this fourteen year old's future. Closure at the expense of his birth relationships is meaningless. Permanency to a fourteen year old whose only remaining blood relationships are terminated is meaningless. No further closure or permanency will be achieved. In a short time, he will reach majority and choose for himself. At that point, he may well choose to work at reestablishing a relationship with the respondent.[2] Nothing is gained by depriving him of that relationship at this time.

Only one participant in this case has anything to gain by a termination of the parental rights of the respondent—the petitioner. Although not strictly before us, it is evident from the record that the petitioner chose to pursue termination against the advice of Barbara P. Berkowitz, a child psychologist. Berkowitz emphasized that the child needed to consent to any plans for adoption or adoption would not work. Additionally, she indicated that permanent foster care would achieve the same goals as the termination of the respondent's parental rights. Simply put, according to Berkowitz, who was qualified as an expert witness,[3] leaving the child in permanent foster care would have the same positive effects as termination of the respondent's parental rights, but without any of the harmful side effects of severing all ties with his biological family.

The petitioner also chose to pursue termination contrary to the express recommendation of the child's

[2] Barbara Stark, a program supervisor employed by the department of children and families, conceded in her testimony that the child may want to reconnect with the respondent in the future and that confronting his issues with her may help him to move forward in his development toward adulthood.

[3] "The psychological testimony from professionals is rightly accorded great weight in termination proceedings. *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987)." (Internal quotation marks omitted.) *In re Kezia M.*, 33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

guardian ad litem, who indicated that it *was not in the child's best interest to terminate the respondent's parental rights at this time.*[4] The guardian ad litem further testified that she had never discussed termination with him because she did not want to upset him and was concerned with the possibility of his being "closed off" from people he valued. In short, it was the guardian ad litem's opinion that termination was an excessive measure that was unwarranted under these circumstances.

Moreover, the record before this court reveals that the child's counsel made clear that the child has no wish for and takes no position in favor of terminating the respondent's rights. Further, there was no indication that he rejected a possible future reconciliation. The reasons cited by the court—closure and permanency—while traditional concepts in this field, are mere artifices, irrelevant to this fourteen year old child at this stage of his life. Nothing in the record indicates that a wish for *closure* of the respondent's relationship with the child or permanent foster status without natural or adoptive parents was expressed by the child.[5] In fact, the court's findings do not reveal in any sense that the child seeks *closure* of his relationship with the respondent. Although he does not want to communicate with her at present, he will soon reach majority and may

---

[4] Attorney Mildred Doody, the child's guardian ad litem, testified that she believed that "for the present time, it would be in [the child's] best interests to remain in his present placement, but with a plan of long foster care." She explained that the fact that the foster family was not ready to take the significant step of adoption, coupled with the child's clearly expressed desire to continue his relationship with his brother, aunt and grandmother was the basis for her opinion. She further stated that the child never expressed a desire to have the respondent's parental rights terminated. In short, she disagreed with the petitioner regarding the need to terminate the respondent's parental rights.

[5] Barbara Stark, a program supervisor employed by the department of children and families, stated that she had never spoken with the child, himself.

well change his mind in the future.[6] He assuredly does not seek closure of his blood relationships with other relatives, which will occur as a result of the termination. He merely wants to remain where he is until the age of majority. The child surely did not introduce ideas of closure, permanency or stability in this situation. These concepts are imposed by others on his situation. It can be inferred that closure and permanency will benefit only the petitioner, which will not have to address the respondent's needs and concerns further. Surely this is not in the child's best interest.

We have stated that "[t]his court is ever mindful of the gravity of the proceeding that may end in the termination of parental rights and results in the complete severance of the legal relationship, *with all its rights and responsibilities, between the child and the parent.*" (Emphasis added.) *In re Ashley M.*, 82 Conn. App 66, 70–71, 842 A.2d 624 (2004); see also *In re Kachainy C.*, 67 Conn. App. 401, 406, 787 A.2d 592 (2001). "The interest of parents in raising their children, and in their children in general, is a fundamental right. *That right warrants deference and protection. Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). Termination of parental rights does not follow automatically from parental conduct that might justify the removal of a child from the natural parental home." (Emphasis added.) *In re Alexander T.*, 81 Conn. App. 668, 672–73, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004).

The termination of the respondent's parental rights represents a drastic step that, in my view, should not have been taken. In a real sense, this is a case in which traditional analysis, traditional concepts and traditional

---

[6] Renata Tecza, a permanency planning social worker employed by the department of children and families, testified that it was common for children to be upset by seeing their parents incarcerated.

language are not relevant to the facts. With due respect to the evidence of the child's laudable progress, it cannot be disputed that the child achieved that progress while in the present, uncertain situation; nothing in the record suggests that his progress would be jeopardized if termination is not granted. This child does not need the termination of the respondent's parental rights to *move on*. He has already done so and, at present, is in the best possible position despite his difficult and challenging childhood. In terminating the respondent's parental rights and the child's legal connection with the respondent's family, with only four years of minority left and no serious prospects of any other permanent family, the child loses, rather than gains, from what I am compelled to see as a thoroughly ill-advised course of action on the part of the petitioner.

For the foregoing reasons, I respectfully dissent.