******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom ZARELLA, J., joins, dissenting. I disagree with the trial court's determination, upheld by the Appellate Court, that the petitioner, the Commissioner of Children and Families,[1] made reasonable efforts to reunify the respondent with her minor child, Gabriella A.[2] *In re Gabriella A.*, 154 Conn. App. 177, 188, 104 A.3d 805 (2014). I am troubled by the fact that the petitioner moved to terminate the respondent's parental rights after admitting that her initial treatment was inadequate, referring her for more appropriate treatment, and not inquiring into her progress in that treatment before filing the petition. Even more problematic is the petitioner's reliance on the respondent's insufficient progress in her previous therapy—which the *petitioner* referred her to and later admitted did not address her particular issues—in seeking to terminate her parental rights. I, further, disagree with the majority that the petitioner met the burden of proving that the respondent was unable to benefit from reunification services under these circumstances. I, therefore, respectfully dissent.

In order to terminate parental rights, the petitioner is required to prove by clear and convincing evidence that the petitioner "has made reasonable efforts . . . to reunify the child with the parent . . . unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . ." General Statutes § 17a-112 (j) (1). "The word reasonable is the linchpin on which the [petitioner's] efforts in a particular set of circumstances are to be adjudged . . . . Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004).

Given the fact intensive nature of this inquiry, I briefly recount the petitioner's efforts to reunify the respondent with Gabriella.[3] In December, 2011, the petitioner referred the respondent to Radiance Innovative Services (Radiance) for a mental health assessment, parent education classes, and case management. The petitioner also referred the respondent to the Wheeler Clinic (Wheeler) for substance abuse screenings and counseling. The respondent met weekly with a case manager at Radiance, and completed a seven session counseling program at Wheeler. Wheeler reported no substance abuse issues and "successfully" discharged the respondent in February, 2012. During this time, the respondent also attended a nonoffending caregiver group at the Greater Hartford Children's Advocacy Cen-

ter at Saint Francis Hospital and Medical Center (advocacy center).

The respondent's traumatic history was revealed early on in her treatment. In December, 2011, the respondent's assessment at Wheeler noted that she has experienced "extremely traumatic event[s]," including "[s]exual or physical assault" and the "[s]udden death of someone close" to her. The assessment also notes that she has "intense recollections" of those traumatic life events. Between January and February, 2012, the respondent's participation in the nonoffending caregiver group demonstrated her trauma, as much of her sharing focused on the sexual abuse that she, herself, had suffered as a child.[4] The respondent's mental health assessment at Radiance in May, 2012, revealed that her childhood in Jamaica was "full of chaos, hurt, pain, trauma, and survival."[5] The examiner concluded that the respondent has experienced "significant trauma, loss, and abandonment" and that her "unresolved issues related to her sexual trauma continue to present emotional barriers . . . ." The examiner at Radiance further noted that "[i]t is of utmost importance that [the respondent] becomes involved in a therapeutic process that will address her trauma . . . ."

Despite this consensus, the respondent's subsequent therapy did not address her trauma. Between June and December, 2012, the respondent attended weekly therapy sessions with Tamar Draughn, a licensed professional counselor at Radiance. The respondent made some progress with regard to her anger and depression, but was unable to address her extensive childhood trauma or connect it to her current behavior. Draughn attributed this failure to the fact that the sessions were often conducted in a public place, where the respondent could not speak openly about her painful past.[6] Additionally, because the respondent missed ten of her twenty-four scheduled sessions, Draughn pointed to the inconsistency in sessions as a factor in failing to address her trauma history. Three of those ten sessions, however, were cancelled through no fault of the respondent. The respondent's medical issues and a court date accounted for several other missed sessions, which she tried to reschedule. During this time, the respondent began weekly supervised visits with Gabriella.

Radiance discharged the respondent on December 7, 2012, when its contract with the petitioner expired. The respondent's discharge summary stated the reason for the discharge was "[p]ayment approval ended." Draughn, who completed the discharge summary, added that "[d]ue to inconsistencies in therapy sessions [the respondent] has not made adequate progress" and that she "struggles to gain insight to a connection between her traumatic experiences and her current perspective and behaviors." Draughn explained that they had only just begun to address the respondent's trauma

when the contract between Radiance and the petitioner ended. Instead, their work had focused on the respondent's emotional issues. Draughn testified that, in hindsight, her "ideal treatment plan" would have been beginning with trauma therapy, which would have allowed the respondent to gain insight into her current perspectives and behavior.[7] All of the respondent's evaluators agreed that the respondent needed to deal with her trauma issues *before* she could gain insight into her present situation.[8] Thus, upon discharge, Draughn recommended that the respondent receive intensive trauma therapy in a private, more traditional setting.

On the basis of this recommendation, the petitioner referred the respondent to Beverly Coker, a licensed clinical social worker at New Beginnings Family Center, LLC. The respondent began attending weekly therapy sessions with Coker in January, 2013.[9] Coker noted that the respondent has "extensive trauma history that she has failed to address" and that a goal of treatment was to "delve into her trauma history and decrease the adverse effects it has." Coker's reports demonstrate that the respondent was "processing the depth of the trauma and its impact," gaining a "good understanding" of its effects, and had "fully explored her physical and psychological history while growing up . . . and her methods of parenting." According to Coker, the respondent was insightful, highly motivated, and missed few, if any, sessions.

On March 14, 2013, before receiving any report from Coker as to the respondent's progress in trauma therapy, the petitioner filed a petition to terminate the respondent's parental rights. The petitioner stated that "although [the respondent] has engaged in services, she either did not do so consistently or has failed to gain substantial benefit . . . ." The respondent's assigned social worker with the petitioner testified that the respondent "had not been consistent with attending . . . therapy and therefore was not addressing her trauma issues . . . ."

The trial court found that the petitioner's efforts to reunify the respondent with her child were reasonable. The Appellate Court agreed, holding that, "in light of the entire record," the petitioner's filing of the termination petition without inquiring into the respondent's progress in trauma therapy did not render the rest of its efforts unreasonable. *In re Gabriella A.*, supra, 154 Conn. App. 186–87. The Appellate Court pointed to the petitioner's referrals as well as the respondent's inadequate progress in addressing her trauma during therapy. Id., 184–88.

The standard of review of the trial court's decision with respect to whether the petitioner made reasonable efforts at reunification is identical to that for whether the respondent is unable to benefit from reunification services. See *In re Jorden R.*, 293 Conn. 539, 552–53,

979 A.2d 469 (2009). Thus, I review the trial court's ultimate determination that the petitioner made reasonable efforts at reunification for evidentiary sufficiency. *In re Shane M.*, 318 Conn. 569, 588, 122 A.3d 1247 (2015). I review the trial court's factual findings underlying this determination for clear error. Id., 587.

In my view, the unreasonableness of certain aspects of the petitioner's reunification efforts is worth noting. Although the respondent's trauma history was revealed early in the process, the petitioner did not recommend trauma therapy until one year into her treatment. When it was, the petitioner then faulted the respondent for not addressing her trauma earlier. At the same time, the petitioner acknowledged that the respondent's treatment thus far had been insufficient for addressing her trauma. The petitioner then sought to terminate the respondent's parental rights without examining her progress in trauma therapy.[10] In my view, the petitioner should not deal with parents who are struggling with mental health issues and making a bona fide effort to rehabilitate in this manner. See *In re Natalya C.*, 946 A.2d 198, 204 (R.I. 2008) ("[i]t is unreasonable for [the petitioner] to rely on parents . . . who lack necessary expertise and perspective, and who labor under the burden of [mental health] challenges, to diagnose their own problems"). As we have previously stated, "an important goal of the child protection statutes, in addition to protecting children from abuse and neglect, is to preserve family integrity by . . . teaching parents the skills they need to nurture and care for their children."[11] *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 754, 865 A.2d 428 (2005).

I realize that it sometimes takes time to uncover a client's trauma in therapy, and once the extent of the respondent's trauma was discovered, the petitioner properly referred her for more appropriate treatment. The petitioner's efforts up to this point seem fairly reasonable, given the complicated issues with the respondent and her family. I merely take issue with the timing of the petitioner's move to terminate the respondent's parental rights in this unique context.

The respondent's substantial compliance with reunification services further belies the reasonableness of the petitioner's actions. A parent's cooperation, or lack thereof, with reunification services informs our analysis of what efforts are reasonable under the circumstances. See *In re Alexander T.*, 81 Conn. App. 668, 672–73, 841 A.2d 274 (2004) (stating that, in making reasonable efforts determination, "parallel analysis of the respondent's response to those efforts is necessary" and holding that "the efforts of the [petitioner] were reasonable *in light of the respondent's conduct*" [emphasis added]), cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). For example, in *In re Joseph M.*, 158 Conn. App. 849, 855–58, 120 A.3d 1271 (2015), the Appellate Court recently held

that the petitioner's reunification efforts were reasonable when a father failed to attend therapy, his child's medical appointments, or his administrative case reviews, and became increasingly unreliable in attending supervised visits with his child.

Unlike *In re Joseph M.* and many other termination cases,[12] this is not a situation in which the parent's lack of cooperation thwarted the petitioner's efforts. The respondent successfully completed a seven session counseling program at Wheeler and several substance abuse evaluations. The respondent's assessment noted that she was "[on time], oriented, and . . . cooperative . . . ." The respondent has consistently attended her weekly case management meetings with Radiance as well as her weekly supervised visits with Gabriella[13] while attending therapy. The respondent also attended six of the seven sessions of the nonoffending caregiver group at the advocacy center and scored well on the subsequent test administered by the program. See footnote 4 of this opinion.

The petitioner greatly relied on the respondent's missed therapy sessions with Draughn in seeking to terminate her parental rights. Draughn, however, explained that she had cancelled some sessions in the months where she only saw the respondent once or twice. Although Draughn noted the inconsistency in sessions in her discharge summary, she consistently maintained that the missed sessions played little part in the decision to discharge the respondent.[14] Regardless, the respondent had been in therapy with Coker for approximately two months before the petitioner filed the termination petition, and had consistently attended those sessions. Coker testified that the respondent attended "at least" twelve sessions between January and March, 2013. She noted that the respondent was "consistent" and "punctual" in attending sessions and "call[ed] ahead the few times that she was unable to attend." However, because the record indicates that the petitioner did not inquire into the respondent's progress in trauma therapy, the petitioner did not learn this information before seeking to terminate her parental rights.

In expressing these concerns, I do not contend that the respondent has rehabilitated to the point where she can successfully parent her child. The reasonableness of the petitioner's reunification efforts is distinct from the respondent's rehabilitative progress. See, e.g., *In re Melody L.*, 290 Conn. 131, 148–49, 962 A.2d 81 (2009) (reasonable efforts finding differs from analysis of whether grounds for termination exist), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 746–47, 91 A.3d 862 (2014). I do not disagree with the trial court's finding that the respondent "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, con-

sidering the age and needs of the child, [she] could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (ii). I simply question whether the recommendation of counsel for the minor child that Gabriella remain committed to the petitioner and "go from there" would have been more appropriate than termination in the present case.

I understand that placing a child into a stable and permanent environment as soon as feasibly possible is critically important to the child's proper development. "[S]table and continuous care givers are important to normal child development. Children need secure and uninterrupted emotional relationships with the adults who are responsible for their care. . . . Repeatedly disrupted placements and relationships can interfere with the children's ability to form normal relationships when they become adults." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 494–95, 940 A.2d 733 (2008). In the present case, however, although timing was understandably a concern given the age and needs of Gabriella,[15] the petitioner shoulders at least some responsibility for the delay in the respondent's progress in therapy.

I also realize that the petitioner must make difficult decisions about the well-being of the children in her care on a daily basis. See *In re Davonta V.*, 98 Conn. App. 42, 48, 907 A.2d 126 (2006) (acknowledging that determination of what is in best interest of child is "difficult task"), aff'd, 285 Conn. 483, 940 A.2d 733 (2008). Understandably, "[t]he primary concern of [the petitioner] is the safety of [the child]." (Internal quotation marks omitted.) *In re Christine F.*, 6 Conn. App. 360, 368, 505 A.2d 734, cert. denied, 199 Conn. 808, 508 A.2d 769 (1986). Devastating consequences can result when children return to homes where they are neglected or abused, and the petitioner plays an important role in preventing these situations. Nonetheless, the petitioner should not take lightly the "complete severance" of the relationship between a parent and child, especially when the parent has cooperated with reunification services and shown the potential for rehabilitation.

"Both the United States Supreme Court and this court recognize that a parent's interest in making 'decisions concerning the care, custody, and control of [his or her] children' . . . *Fish* v. *Fish*, 285 Conn. 24, 41, 939 A.2d 1040 (2008); is a fundamental right protected by the fourteenth amendment to the United States constitution. See *In re Devon B.*, 264 Conn. 572, 584, 825 A.2d 127 (2003); see also *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). This right encompasses 'the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state.' . . . *Lehrer* v. *Davis*, 214

Conn. 232, 237, 571 A.2d 691 (1990)." *In re Jason R.*, 306 Conn. 438, 464–65, 51 A.3d 334 (2012) (*Zarella, J.*, dissenting). Indeed, it is among the oldest fundamental liberty interests recognized by the United States Supreme Court. *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); see *Roth* v. *Weston*, 259 Conn. 202, 218, 789 A.2d 431 (2002).

Thus, as my dissent noted in the matter of *In re Jason R.*, 129 Conn. App. 746, 774, 23 A.3d 18 (2011), aff'd, 306 Conn. 438, 51 A.3d 334 (2012), the termination of an individual's parental rights is one of the most drastic actions that a state takes against its citizens. "The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is a most serious and sensitive judicial action. . . . Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children undeniably warrants deference and, absent a powerful countervailing interest, protection." (Citations omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 640, 436 A.2d 290 (1980); see also General Statutes § 17a-93 (5). Accordingly, it is through this judicial lens that this court must thoroughly review the termination of an individual's parental rights.

In light of the seriousness of the intrusion on the respondent's constitutional rights, I disagree with the trial court that the petitioner's efforts to reunify the respondent with her child may be deemed "reasonable." I find it very disturbing that the petitioner, at least in part, caused the respondent to receive the wrong type of therapy and then, due to time constraints, was unable to give her sufficient time to rehabilitate in trauma therapy before seeking to terminate her parental rights. I am deeply troubled by what appears to be the petitioner abruptly giving up on the respondent after initially sending her for improper therapy, referring her for more appropriate therapy, and not glancing at her progress before seeking to terminate such an important constitutional right.

Furthermore, under these circumstances, I cannot agree with the majority that the petitioner met the burden of proving that the respondent is unable to benefit from reunification services. When seeking to terminate a parent's parental rights, the petitioner must prove *either* the reasonableness of reunification efforts *or* the parent's inability to benefit from such efforts by clear and convincing evidence. General Statutes § 17a-112 (j) (1); *In re Jorden R.*, supra, 293 Conn. 552–53. In the present case, however, the question of whether the petitioner made reasonable efforts to reunify the respondent with her child is inextricably linked to the question of whether the respondent can benefit from

such efforts.[16] Because the petitioner's efforts were *unreasonable*, we cannot determine whether the respondent could have benefited from *reasonable* efforts. Specifically, because the petitioner did not provide trauma therapy until one year into the respondent's treatment, we cannot know whether the respondent could have benefited from trauma therapy and sufficiently rehabilitated in time to meet Gabriella's needs had she received it at the beginning of her treatment.[17] We can only speculate on this scenario. At the very least, however, the petitioner's contention that the respondent was unable to benefit from therapy, when she had been in the appropriate therapy for only two months, was questionable. With such an important constitutional right at stake, I cannot agree that the petitioner proved, by clear and convincing evidence, that the respondent was unable to benefit from reunification services on these facts.

I, therefore, respectfully dissent.

[1] For the sake of consistency with the majority opinion, all references to the petitioner in this opinion include the Department of Children and Families. See footnote 3 of the majority opinion.

[2] Because the petitioner can prevail by showing either reasonable efforts at reunification or that the respondent is unable to benefit from reunification services; *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009); the majority does not address the reasonableness of the petitioner's reunification efforts.

[3] Under our Appellate Court's jurisprudence, it is "well settled" that courts may only consider facts preceding the date of the termination petition when making a reasonable efforts determination. *In re Joseph M.*, 158 Conn. App. 849, 862, 120 A.3d 1271 (2015); see *In re Kylik A.*, 153 Conn. App. 584, 596, 102 A.3d 141, cert. denied, 315 Conn. 902, 104 A.3d 106 (2014); see also Practice Book § 35a-7 (a) ("[i]n the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights"). Although neither party has raised this issue, I generally limit my analysis to the events preceding the date of the termination petition in accordance with this case law.

[4] The purpose of the group at the advocacy center was to "help parents/caregivers support their child after an allegation of sexual abuse and to prevent further abuse." The trial court faulted the respondent for her participation in the nonoffending caregiver group because she had appeared to focus on her own victimization as a child, rather than Gabriella's victimization, and appeared angry and vengeful. The manager who expressed these concerns, however, explained that parents are normally interviewed before joining the group, because "[n]ot all people are ready to come in." The respondent never received an interview and the manager testified that this was "unusual." The group also ended three months before she began attending weekly therapy and nearly one year before she began trauma therapy. Nonetheless, the trial court stated that her participation in the group at that time "seem[ed] to be more representative of where . . . [she is] along the spectrum of rehabilitation."

[5] The respondent described how her stepfather attempted to sexually assault her, which caused her to drop out of school. In 2007, the respondent's older brother, whom she was closest to and admired, was killed in Iraq.

[6] The respondent's therapy sessions were held at libraries and other community venues.

[7] It is therefore no surprise that Draughn noted the respondent's "[struggle] to gain insight" and difficulty reflecting on childhood experiences in her discharge summary.

[8] The respondent's assessment at Wheeler noted her history of trauma. Beverly Coker, the respondent's subsequent therapist, testified that she began by exploring the respondent's childhood trauma and then prompted her to connect those experiences to her current perceptions and behaviors.

Derek A. Franklin, a clinical psychologist who evaluated the respondent in August, 2013, also opined that the respondent needed to address her trauma before she could gain any level of insight into her present situation.

[9] As the majority notes, the adequacy of Coker's treatment in addressing the respondent's trauma is also in dispute. The trial court did not make a finding in this respect. However, because the petitioner did not wait to receive a progress report from Coker before moving to terminate the respondent's parental rights, this issue is not particularly relevant to my analysis. See footnote 3 of this opinion. Even assuming Coker's treatment was ideal, the petitioner's failure to look into the respondent's progress remains, in my view, highly problematic.

[10] The petitioner essentially forced the respondent to take part in a game of Calvinball to avoid termination of her parental rights, which she inevitably lost. See 2 B. Watterson, The Complete Calvin and Hobbes (2005) p. 292; see also N. Lapsatis, "In the Best Interests of No One: How New York's 'Best Interests of the Child' Law Violates Parents' Fundamental Right to the Care, Custody, and Control of Their Children," 86 St. Johns L. Rev. 673, 673–74 (2012). Calvin, a character in the famous comic Calvin and Hobbes, created Calvinball with the intention of creating the most disorganized game possible. N. Lapsatis, supra, 673. The only permanent rule in Calvinball is that the game can never be played with the same rule twice. Id. In Calvinball, any player can change the rules at any point in the game, the score is kept without any logic or consistency, and penalties are given in any way deemed fit. Id.; see also id., 673 n.6 (" 'The score is still Q to 12!' "). The petitioner apparently observed these rules by prescribing treatment by which the respondent could avoid termination, changing that treatment after determining that it was inadequate, blaming the respondent for not progressing quickly enough, and then seeking to terminate the respondent's parental rights without giving her time to succeed in the proper treatment. See id., 673–74 (arguing that "New York family law has adopted the Calvinball approach [to] determining [child] custody disputes"). With the petitioner changing the rules of the game in this manner, the respondent had no chance of avoiding termination of her parental rights.

[11] I commend the petitioner for continuing to provide reunification services to the respondent even though the petitioner had determined that she was unable to benefit from such services. See In re Jorden R., supra, 293 Conn. 552–53.

[12] See, e.g., In re Destiny D., 86 Conn. App. 77, 79–80, 83–84, 859 A.2d 973 (mother erratically attended rehabilitative programs, resisted treatment recommendations, received positive drug tests, and refused to sign releases that would have allowed petitioner to make additional referrals), cert. denied, 272 Conn. 911, 863 A.2d 702 (2004); In re Alexander T., supra, 81 Conn. App. 674 (mother failed to attend drug screenings and evaluations and did not visit her children for nine months); In re Ebony H., 68 Conn. App. 342, 346, 789 A.2d 1158 (2002) (mother arrested several times, failed to attend anger management and domestic violence counseling, and repeatedly tested positive for cocaine use).

[13] The trial court's finding that the respondent was using her visits with Gabriella to obtain additional counseling sessions for herself is questionable. Although the petitioner's facilitator testified that the respondent spent approximately 50 percent of the visit conversing with her once they got to know one another, several months into the visitation, she explained that during that time, the respondent was sitting on the floor talking to the child, playing games with the child, and "d[id]n't ignore the child." Additionally, many of their discussions focused on the child's well-being. The facilitator testified that the respondent and the child interacted well together. Franklin, the psychologist who evaluated the respondent in August, 2013, and observed the respondent and her child together, agreed, stating that the respondent and her child had developed some sort of bond.

[14] Draughn testified that she would have liked to continue working with the respondent. She stated that the respondent never verbalized an unwillingness to engage in therapy and was otherwise "very engaged." The following colloquies demonstrate that the respondent was discharged because the contract was ended by the petitioner. One colloquy occurred between Draughn and counsel for the respondent:

"Q. But [the petitioner] ended your contract.

"A. Correct.

"Q. You weren't asking for them to end your contract, correct?"

"A. No, I did not ask.

"Q. Okay. No one at Radiance said we don't want to work with [the

respondent] anymore, right?

"A. No.

"Q. And that is not why [the petitioner] ended your service to her?

"A. No."

A similar colloquy occurred between Draughn and counsel for the petitioner:

"Q. Okay. And what was the reason for the discharge?

"A. Well, the primary reason was [the respondent's] contract ended and it was not renewed.

"Q. Okay. Were there other reasons? . . .

"A. I am not aware of any other reasons."

Another colloquy occurred between Draughn and counsel for the respondent:

"Q. . . . When you say she didn't meet her goals, can you just elaborate on that? [Did] you mean [that] she didn't even try to meet them . . . ?

"A. No. I mean the contract expired prior to [the respondent] reaching her goals.

"Q. Okay. So was she in the process of reaching her goals before the contract expired?

"A. She had her own limitations in the process, but the process was happening."

Finally, Draughn offered the following testimony regarding the respondent's prognosis: "I do believe with good clinical work and vested work from the [respondent] that she can achieve adequate goals."

[15] The trial court noted that it arrived at its decision in light of Gabriella's need to develop a bond with her caregiver immediately.

[16] I recognize that the petitioner need not prove *both* reasonable efforts at reunification *and* the parent's inability to benefit from reunification services. I merely note that, under these unique circumstances, the petitioner's failure to give the respondent time to rehabilitate in the proper therapy renders us unable to conclusively determine whether the respondent can benefit from reunification services.

[17] The majority contends that the trial court found that the respondent's inability to benefit from reunification services stemmed solely from her own "belief that she had no problems that required treatment," and, accordingly, that the services provided to her played no part in this determination. The trial court, however, also based its conclusion on the extent of the respondent's trauma and the time it would take to address that trauma. For example, the court noted that Franklin contributed "two things" to its decision, one of which was his conclusion that "the child can't wait." The court stated that "there has been a tremendous amount of trauma in [the respondent's] background. And it's very sad. It's not something that [she] can really work out in [one] year, in two years maybe . . . ." The court nonetheless credited Coker's opinion that the respondent was progressing in trauma therapy. Thus, my contention that the inadequacy of the respondent's therapy tainted her ability to benefit from therapy is not inconsistent with the trial court's factual findings, and I need not determine that those findings were clearly erroneous to reach my conclusion.