******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES E. BURNS, JR. *v.* DAVID Y.
ADLER ET AL.
(AC 34565)
(AC 35005)

Sheldon, Mullins and Schaller, Js.

*Argued January 20—officially released July 28, 2015*

(Appeal from Superior Court, judicial district of
Litchfield, Danaher, J.)

*David N. Rosen*, with whom were *James Maguire*
and *David Hunter Smith*, and, on the brief, *Steven D.
Ecker* and *M. Caitlin S. Anderson*, for the appellants
in AC 34565 and the appellees in AC 35005 (named
defendant et al.).

*William C. Franklin*, for the appellee in AC 34565
and the appellant in AC 35005 (plaintiff).

*Opinion*

SHELDON, J. These appeals arise from an action by the plaintiff, James E. Burns, Jr., doing business as Jim Burns Handyman, to foreclose on a mechanic's lien he had filed against a parcel of real property owned by the defendant David Adler, in Salisbury, and to recover damages from Adler, on grounds of breach of contract and unjust enrichment, for unpaid work he had performed at the property on the defendant's home.[1] In the first part of a bifurcated trial, the court focused exclusively on the plaintiff's claims for damages, together with the defendant's special defenses to those claims and parallel counterclaim for damages, based principally upon the plaintiff's alleged noncompliance with certain provisions of the Home Improvement Act (act), General Statutes § 20-418 et seq. The trial court ordered the defendant to pay restitution to the plaintiff for the value of his unpaid work, despite the plaintiff's noncompliance with the act, due to the defendant's bad faith conduct toward the plaintiff, as pleaded in avoidance of the special defenses in the plaintiff's reply. In the second part of the trial, which focused exclusively on the plaintiff's claim for foreclosure of his mechanic's lien on the defendant's property, the court rendered judgment in favor of the plaintiff pursuant to a stipulation of the parties, but denied the plaintiff's subsequent motion for a supplemental judgment, insofar as it sought attorney's fees under General Statutes § 52-249 (a) in connection with his prosecution of the foreclosure claim. These appeals followed. In AC 34565, the defendant claims error in the judgment of the trial court awarding restitution to the plaintiff under the bad faith exception to the act. In AC 35005, the plaintiff claims error in the supplemental judgment of the trial court denying his request for attorney's fees in connection with the foreclosure of his mechanic's lien. We affirm the judgments of the trial court.

## FACTUAL AND PROCEDURAL HISTORY

The following facts and procedural history, as found by the trial court in its memorandum of decision, are relevant to our resolution of these appeals. "The plaintiff . . . is a high school graduate who began carrying out sophisticated building projects in 2000. Most of his work was based on oral agreements with his customers. In September, 2007, the plaintiff had conversations with [the defendant] about renovations and remodeling on a 'weekend' home that [the defendant] and his wife . . . Amie R. Weitzman, planned to buy in Lakeville . . . . [The defendant] earned a law degree in 1988, passed the bar [examination] in 1990, and, thereafter, practiced law until he became an investment banker. [The defendant] also had prior experience supervising renovation projects on his other properties. Weitzman is a professional interior designer.

"The preliminary talks between the parties were very general in nature. [The defendant] wanted substantial demolition in the Lakeville house, the addition of a second floor, and he wanted to expand the house's footprint, but most of all, he wanted the work to be done as quickly as possible so that the [defendant and Weitzman], whose primary residence is in New York City, could use the house during the summer of 2008. When the project was completed, the [defendant] had made payments to the plaintiff in the amount of $985,000. However, the plaintiff alleges that the [defendant] declined to pay him the balance due, which, the plaintiff alleged in his complaint, is $214,039.09.

"On December 2, 2008, the plaintiff brought suit against the [defendant] and Weitzman, as well as the Salisbury Bank and Trust Company. The operative complaint is a revised complaint filed on February 17, 2009. It alleges that the plaintiff entered into an agreement with the [defendant] to effect improvements to a home located at 135 Interlaken Road [in] Salisbury . . . . The plaintiff claims that he performed the services requested, but that he was only partially paid for his efforts. The complaint is in three counts seeking foreclosure of a mechanic's lien, and alleging breach of contract and unjust enrichment, respectively.

"The [defendant] denied the allegations of the complaint and raised six special defenses. The [defendant] also filed a four count counterclaim, in which [he] alleged a violation of the Connecticut Unfair Trade Practices Act ('CUTPA') [General Statutes § 42-110a et seq.], negligence, breach of contract and unjust enrichment. The plaintiff, in turn, denied the allegations of the counterclaim and raised two special defenses.

"The parties agreed that the issue of foreclosure of the mechanic's lien would be bifurcated from the primary trial and, if necessary, addressed in a separate hearing. Furthermore, both parties sought attorney's fees, but agreed that this issue would also be bifurcated from the primary trial and, if necessary, addressed in a separate hearing.

"This matter was first tried to the court on October 27, 2011. The trial continued on November 2, 3, 4 and 10, 2011. The parties filed simultaneous posttrial briefs on January 6, 2012, and simultaneous reply briefs on January 17, 2012.

"At the time of the preliminary discussions, the [defendant] did not have any formal plans to show to the plaintiff. The [defendant] closed on the Lakeville property on or about October 4, 2007, and, absent plans, the plaintiff immediately began work demolishing the interior. Thereafter, the plaintiff's immediate tasks were to reconfigure some of the rooms and plan for the addition of a second story.

"The record reflects three significant issues that were

manifest throughout the project and ultimately helped bring about this litigation. First, the project evolved continuously from beginning to end. Second, the parties shared a mutual disregard for the provisions of [the act] and for documentation, in general. Third, the [defendant and Weitzman] were so focused on completing the project expeditiously that they made expense, quality control and personal responsibility for the project all subordinate to the goal of completing the project on time. [The defendant] testified that he knew that making 'speed' a priority would make the project more expensive, but he did not think that such a focus would have a significant impact on the cost of the project or that the nine month time frame reflected a tight schedule. The record reveals, however, that [the defendant] knew little about the details of construction and renovation, and so he had no legitimate basis for reaching the latter conclusions.

"The record reflects that the plaintiff and [the defendant] entered into a very rudimentary general contract dated October 5, 2007, that had a 'start date' of October 11, 2007. . . . The contract was a time and materials contract providing for payment at the rate of '$45 per man plus any expenses . . . .' The contract required a twenty thousand dollar deposit, which the [defendant] paid. It does not reflect a completion date for the project because there were no final plans when the contract was signed; indeed, it does not appear that the plans were ever truly finalized. Despite the [defendant's] claims to the contrary, the record does not support the conclusion that the parties ever entered into a fixed price contract.

"The October 5, 2007 contract reflects the plaintiff's effort to conform to the requirements of the [act], a law with which the plaintiff was personally unfamiliar, but which had been mentioned to him by his attorney. The two page contract carries [the defendant]'s signature on page two along with the date of October 9, 2007. [The defendant] is the only signatory on the contract offered into evidence; there is no evidence that Weitzman ever entered into a written contract with the plaintiff. The contract carries three copies of the 'Notice of Cancellation,' as required by the [act]. The copies of the cancellation notice indicate that they are for the customer, the customer's files and the contractor. Bizarrely, [the defendant], in addition to signing the contract, also signed all three copies of the cancellation notice and dated each of them 'October 9, 2007.' . . . The plaintiff, understandably puzzled, called [the defendant] to determine his true intentions with regard to the project.

"[The defendant] testified that he reviewed the contract carefully, but that he did not read the cancellation notices closely, and he 'didn't know what the purpose of the cancellation notice was.' . . . [The defendant]

also testified that he did not notice that the contract lacked a completion date. Nonetheless, throughout his testimony, [the defendant] continued to imply that he had read the contract carefully. The court finds that [the defendant]'s testimony on this issue is not credible. In addition to the foregoing inconsistencies, the record also reflects an e-mail [dated October 10, 2007] from [the defendant], purportedly explaining why he signed the cancellation notices, with the subject line: 'Sorry I had my assistant print it out and just signed everything.' . . . In response to that e-mail, the plaintiff requested a new contract or a letter stating that the original contract was still in effect. [The defendant] never sent a new contract, nor did he send the letter that the plaintiff requested. The plaintiff testified that he signed the contract and gave a copy to the [defendant], but no such copy was introduced at the time of trial.

"The [defendant claims] that [he] never received a completely executed contract. On the other hand, the record does not reflect that [the] defendant ever expressed any concern about [the] apparent failure to enter into an accurate written contract. On the contrary, [the October 10, 2007 e-mail] is representative of the [defendant's] hierarchy of concerns. Specifically, [the defendant]'s reply to the plaintiff's request for written clarification of the cancellation issue stated, '[w]ill do on the contract,' but then [the defendant] immediately shifted to the topic of moving the project quickly, asking the plaintiff to send all samples to him by Federal Express because it would be 'more efficient' in that it would permit the [defendant] to 'make decisions expeditiously.' [The defendant]'s lack of understanding of the practical concerns related to his own project is also suggested in that same [e-mail] in which he requested a price for "quarter-sewn . . . flooring (I don't even know what that is but remember [A]mie . . . and the architect discussing it) . . . .'

"The demolition/renovation/remodeling project at issue ('the project') occupied the plaintiff virtually full-time from the time he entered into the agreement until he was terminated by the [defendant] in September, 2008. The plaintiff accepted no other significant jobs during the foregoing time period. That fact, coupled with the [defendant's] determination not to make the final $214,039.09 payment, put the plaintiff out of business. Without the final payment, the plaintiff could not pay his subcontractors, some of whom brought suit against him. Likewise, the plaintiff could not pay for all of his materials, resulting in some of his materials suppliers bringing suit against him. The plaintiff testified that, as a result, he has no expectation that he can rebuild his business because subcontractors will not work for him in the future, and he will not be able to purchase supplies at contractors' discount prices.

"Throughout the course of the project, the plaintiff

received work orders by telephone and e-mail from multiple sources, including the [defendant and Weitzman], [the] architect, Beth Slotnick, and Weitzman's assistant, Julie Weiner. It is apparent that none of those sending orders to the plaintiff was fully aware of the totality of the orders sent to the plaintiff. In fact, [the defendant] testified that he never saw the many e-mails sent by Weitzman's assistant until the pretrial discovery process. The evidence is convincing and overwhelming that this project took many directions that were never anticipated when the work began. The written plans were revised many times, and the e-mail communications introduced into evidence show that changes to the project were frequent and significant.

"Some of the e-mail orders admitted into evidence compel the conclusion that this project was marked by untrammeled profligacy on the part of the [defendant] and [his] associates. For example, Weitzman's assistant directed the plaintiff, a $45 per hour contractor, to assemble furniture at the house. He was also assigned to roll up rugs, put mattresses on beds, mow the lawn, remove brush and chop firewood. On other occasions, the plaintiff was asked to price various items that the [defendant] intended to purchase and install in the house, such as a wine refrigerator and an oven hood vent . . . which are tasks that do not normally fall to a contractor. In one notable instance, Weitzman's assistant directed the plaintiff to stand by in order to accept a shipment of window shades. Thereafter, she advised him that the shades were the wrong size and urged him to return them promptly before the [United Parcel Service] return label expired. Thus, in order to save the cost of a mailing label, a contractor was effectively hired to do a job that in no way required a contractor's skills.

"The plaintiff testified that he attempted to curb costs by not adding a contractor's markup to subcontractor charges. He also testified that he did not add a surcharge to the cost of materials that he purchased from the suppliers, even though it is customary to do so in his business. As the project went forward, from time to time the plaintiff would ask the [defendant] for payments to cover expenses and to keep the project moving forward, and, in response, the [defendant] initially sent the checks that were requested. The checks were sometimes in the range of forty thousand dollars, and the [defendant] sent them to the plaintiff without asking for an accounting with regard to time or materials expenditures. The plaintiff never sent specific bills to the [defendant], and the [defendant] never requested such bills, at least in the early months of the project.

"The parties originally discussed a total cost of the project in the $400,000 range, but that figure was not based on any specific set of plans, since no final plans existed in the early months of the project. The plaintiff

typically worked six days per week, beginning at 7 a.m. and continuing until 5:30 p.m. Sometimes, afterward, he worked on paperwork associated with the project and, on occasion, worked on Sundays in order to meet the stringent deadline imposed upon him. He testified that the frequent changes in the project made it increasingly difficult to meet the all-important project deadline of early summer 2008.[2]

\* \* \*

"As time went on, the pattern of the . . . change orders [submitted by the defendant, Weitzman, her assistant and the architect] and the plaintiff's requests for regular checks continued unabated. It was not long before the project went well beyond the $400,000 figure that the parties originally discussed. Nonetheless, the [defendant] continued to send checks to the plaintiff as he worked assiduously to meet their demands. It was not until March, 2008, that the [defendant] began to focus on the mounting cost of the project. At that point, the plaintiff presented the [defendant] with a budget report showing a projected total cost of $810,267, reflecting both the expenses up to that point and also the anticipated future expenses based upon the state of the project at that time. . . . On March 25, 2008, the plaintiff sent the [defendant] a slightly revised budget report that showed that the cost of the completed elements of the project was $518,352.93. . . . The revised budget report also indicated that anticipated future expenses would bring the total project cost to $795,038. The report also identified instances of normal contractor charges that were being excluded, such as a 10 percent contractor markup on materials. . . . The record does not reveal that the [defendant] registered any disagreement with the revised budget report. In fact, the [defendant, Weitzman, her assistant and the architect] continued to issue a wide variety of work directions to the plaintiff.

"It was not until May 27, 2008, that the plaintiff submitted another budget report to the [defendant]. . . . At that point, the plaintiff estimated that total cost of the project would be $886,954. However, that budget report also noted that expenses related to certain additional tasks, that the [defendant and the others] requested of the plaintiff, were not included in the foregoing figure. The plaintiff did not estimate the cost for those additional items. . . . The plaintiff advised the [defendant] that he owed substantial sums to his subcontractors and required additional funding to keep them working. . . . [The defendant] testified that, although he was unhappy with the figures reflected in [the May 27, 2008 budget], he elected to continue with the plaintiff as his contractor because he did not want to change contractors in mid-project, as he was in a hurry to use the house. Therefore, the [defendant, Weitzman, the architect and Weitzman's assistant] con-

tinued to ask the plaintiff to do tasks for them, including the placement of furniture. These requests flowed from the [defendant and the others] to the plaintiff through the end of July, 2008. . . . Even though it was clear to the [defendant] that they were going to make more changes and give new assignments to the plaintiff, [the defendant] testified, inexplicably, that he thought the May 27, 2008 budget report reflected the terms of a new, and verbal, fixed price contract. . . .

"On August 25, 2008, the plaintiff submitted 'final numbers' for the project, indicating that the project had cost a total of $1,188,350. By August 4, 2008, the [defendant] had paid a total of $985,000 to the plaintiff, and, therefore, the balance due was $203,350. . . . Even though there was a substantial balance owed to the plaintiff, the work on the project was, at that point, about 98 percent complete, according to the plaintiff. On September 3, 2008, [the defendant] sent an e-mail to the plaintiff, reviewing, in general terms, the expansion of the cost of the project. That e-mail indicated that, although [the defendant] was unhappy with the costs presented to him, he was willing to review the reported charges. [The defendant] also expressed his happiness at the quality of the plaintiff's work, and stated that he wanted the plaintiff to continue to work [on the project], indicating that [he] wanted the plaintiff to execute a '100+ item punch list [he had] provided to [the plaintiff].'

"On September 8, 2008, the plaintiff responded to [the defendant] with another review of the project costs and sought a balance due in the amount of $214,911. . . . On September 12, 2008, the plaintiff provided the [defendant] with a lengthy e-mail, explaining how the costs of the project grew significantly larger in the final months of work. . . . The e-mail included a list of twenty-two numbered items, detailing the added costs. On September 16, 2008, the [defendant] advised the plaintiff that, notwithstanding his explanations for the various charges, the [defendant] had concluded that [he] did not owe the plaintiff anything beyond the $985,000 that [he] had paid as of August 4, 2008. The [defendant] then invited the plaintiff to seek relief through 'the judicial system,' and . . . reminded the plaintiff of the fact that [he] is an attorney.

"Despite having terminated their business relationship in the September 16, 2008 e-mail, the [defendant] sent another message to the plaintiff on September 24, 2008, asking him to complete items on the punch list as well as additional 'extra' items that were not on the punch list. On September 27, 2008, the [defendant] again directed the plaintiff to continue working on the punch list. Further communications indicate that it was the [defendant's] intent that the plaintiff continue to work on the project even into October, 2008. Nonetheless, the [defendant] did not pay the plaintiff's final bill pre-

sented to [him] on August 25, 2008. As a result, the plaintiff lacked the funds to pay what he owed to various subcontractors and to, at least, one supplier. Some of those subcontractors and the supplier ultimately sued the plaintiff. On October 10, 2008, the plaintiff served upon the [defendant], and filed, a certificate of mechanic's lien to secure the $214,039.09 payment that is the subject of this case.

"This case suffers from the fact that neither party was effective at creating or maintaining proper records. The plaintiff did not retain all invoices, but rather calculated his expenses largely from his checkbook records, invoices and time sheets that he did retain. The plaintiff had no employees, but rather did all the administrative work for his business. The plaintiff did not keep all time sheets relative to the project, nor did he keep a daily construction log or any other record that would show which tradesmen were on the site, what work was done, or what materials were delivered to the site on any given day. Rather, the crew members kept their own time sheets. The plaintiff testified that, because he was on site every day, he saw his crew members' work, knew what was being done and paid them for their work when it was justified. The plaintiff never prepared formal bills for the [defendant], but rather would simply ask the [defendant] for more money when he needed it, and the [defendant] sent the checks upon request, until [he] reached the point where [he] decided that [he] had paid enough for the project.

"The defendant, for [his] part, did not request formal bills, backup invoices, time cards or even a formal accounting until they were far into the project. In fact, it does not appear that the [defendant] ever asked for backup documentation to support the plaintiff's various requests for payment. The project plans were revised many times and, even when the plans arguably reached a 'final' stage, the [defendant, Weitzman, her assistant and the architect] continued to direct the plaintiff to carry out additional, ad hoc assignments throughout the summer of 2008. The evidence is clear that at least four different people gave work orders to the plaintiff, including [the defendant and] Weitzman, [the] architect and Weitzman's assistant, throughout the course of the project. The evidence supports the conclusion that of the four people giving orders to the plaintiff, none of them had a complete understanding of what each of the other members of the group was telling the plaintiff to do." (Citations omitted; footnotes altered.)

## TRIAL COURT'S FACTUAL FINDINGS AND LEGAL CONCLUSIONS WITH RESPECT TO PLAINTIFF'S CLAIM FOR RESTITUTION UNDER BAD FAITH EXCEPTION TO ACT

The court determined that the plaintiff had failed to comply with the act,[3] and thus that he was statutorily precluded from recovering damages on either his

breach of contract claim or his unjust enrichment claim. This conclusion, however, did not end the court's inquiry, for it went on to consider the plaintiff's plea in avoidance as to the defendant's special defense of noncompliance with the act based on the defendant's alleged bad faith in invoking the act as a basis for not compensating him for his services. On that issue, the court found the following additional facts. "The parties' relationship began to strain in early March, 2008, when [the defendant] started asking for a detailed explanation of the charges associated with the project. At that point, the cost had more than doubled beyond the original $400,000 figure that the parties discussed originally. However, even though [the defendant] continued to send checks as requested from the period of October, 2007 through March, 2008, and even though their total far exceeded the original $400,000 estimate, there is no evidence that [the defendant] ever sought copies of bills, invoices, receipts or any other accounting except asking the plaintiff to list the expenses, which the plaintiff did in a single, two page document. . . . That document was entitled, 'Upcoming Expenses,' and showed that the expenses would, at that point, total nearly $300,000. [That document] also showed that the current expenditures on the project totaled $521,944, and that [the defendant] had paid $365,000, leaving a balance owed—separate from any future expenses—of $156,944.

"Notwithstanding the foregoing mushrooming expenses, [the defendant], along with Weitzman, [her] assistant and the architect, continued to assign tasks to the plaintiff without making corresponding inquiries regarding the expenses associated with those tasks.[4]

* * *

"The court is unable to find any timely inquiry of any kind, from [the defendant] or any other person authorized to assign tasks to the plaintiff, regarding the expense associated with any [such additional] job orders. This pattern continued through May, 2008. On May 23, 2008, the plaintiff advised [the defendant] of extra items that had not been 'priced and/or figured as there [were] some last minute changes as we near the end.' . . . The latter message reminded [the defendant] that the plaintiff would have debts to subcontractors. On May 27, 2008, the plaintiff advised [the defendant] that the project cost had grown to $886,954, but that other items were still to be completed and those costs were not included in the latter figure. . . . In that message, the plaintiff advised [the defendant] that subcontractors were requesting payment for their work, and that he was 'very much' in arrears at that time and required 'a substantial payment' to meet those debts. . . .

"After the May 27, 2008 message, work orders continued to flow to the plaintiff, directing him to handle

furniture delivery and assembly, as well as larger tasks, such as the possible installation of mahogany for the deck, and also urging the plaintiff to complete a dock so that it would be operational when [the defendant]'s children returned from camp. That message noted that [the defendant] was wiring a $40,000 payment to the plaintiff. . . . [The defendant] sent additional work requests to the plaintiff on July 28, 2008, advising him, *inter alia*, that 'we definitely need a boat/kayak holder—it should hold 3 kayaks and 1 canoe.' . . .

"The plaintiff sent a final bill on August 28, 2008, showing a total cost of $1,188,350, payments of $985,000 and a balance due of $203,350. On September 3, 2008, [the defendant] advised the plaintiff that he believed he had paid everything that he owed. [The defendant] told the plaintiff that he required additional justification 'before I consider any additional payments to you . . . .' He acknowledged that the plaintiff was indebted to subcontractors, and noted that the plaintiff had not begun to address the '100+ item punch list we have provided to you. We have been very happy with the quality of your work generally and it is my hope that we can resolve this matter amicably.' . . .

"The plaintiff responded with detailed explanations of the costs associated with the project. . . . He made abundantly clear to [the defendant] that he was significantly indebted to subcontractors. . . . As early as September 9, 2008, [the defendant] was seeking an attorney to address his financial disagreement with the plaintiff. . . .

"On September 16, 2008, [the defendant] advised the plaintiff that '[w]e are at the end of the road.' [The defendant] claimed that he had spent many hours reviewing the plaintiff's explanations and had 'concluded that I do not owe you any additional amounts.' He advised the plaintiff that he would be hiring a new contractor to complete items on the punch list, and he invited the plaintiff to bring suit, warning him that, '[a]s an attorney I expect to represent myself. If you choose to commence litigation, I will seek reimbursement from you for the costs of completing the punch list . . . . We are officially and immediately terminating our relationship.' . . . This message constituted a termination of the agreement between the parties. . . .

"Despite the foregoing, [the defendant] continued to ask the plaintiff to work on the project. On September 17, 2008, [the defendant] gave the plaintiff permission to enter the house to work on the punch list. On September 24, 2008, [the defendant] sent the plaintiff a detailed list of punch list items that he wanted the plaintiff to complete, noting that he was 'anxious to get all of these items done . . . .' " (Citations omitted; emphasis added; footnote omitted.) The court continued: "On October 7, 2008, [the defendant] inquired further as to the plaintiff's progress on the punch list, noting that he

did not want the plaintiff working on the punch list during an upcoming weekend when [the defendant] and his family would be using the house. . . . Shortly thereafter, [the defendant] received notice of the service of a mechanic's lien and, for that reason, [the defendant] barred the plaintiff from the premises, and [the defendant] advised the plaintiff that another contractor would be hired to do further work. . . .

"It is readily apparent to the court that when [the defendant] made his final payment on August 4, 2008, he had no intention of ever making any further payments. [The defendant] received detailed explanations for the charges from the plaintiff, but offered no detailed response, other than to claim that he had reviewed the plaintiff's reports and disagreed with them. [The defendant] knew that many subcontractors were working on the project and that the plaintiff was indebted to them. [The defendant] knew that the plaintiff had purchased significant materials for the project and that the plaintiff was indebted to the suppliers. Further, both [the defendant] and the plaintiff knew that by August 4, 2008, the project was largely complete. Thus, even if [the defendant] elected not to pay the plaintiff for the work done to that point, the project itself was not at risk, since [the defendant] could easily get another contractor to finish the tasks that remained, which is what happened. Therefore, it did not really matter if [the defendant] could not trick the plaintiff into finishing the entire punch list, which, again, is what happened.

"A person of significantly less sophistication than [the defendant] would have known that the end-of-project billing dispute that mushroomed in August and September, 2008, created a serious risk of putting the plaintiff out of business if [the defendant] did not pay the bills that he owed. In fact, that is exactly what happened at some point after the plaintiff filed his mechanic's lien. It was the plaintiff's fear of losing his business that gave [the defendant] enormous leverage over the plaintiff, thus compelling the plaintiff to go on working for [the defendant], hoping against hope—vainly, as it turned out—that [the defendant] would ultimately pay the plaintiff for all of his work.

"The messages between [the defendant] and the plaintiff reflect a homeowner who knew, and took advantage of the fact, that his contractor had limited assets and desperately needed to be paid. As late as September, 2008, [the defendant] assured the plaintiff that the [defendant was] satisfied with the quality of the plaintiff's work, and [the defendant] then implied that he might make further payments to the plaintiff, thereby inducing the plaintiff to continue to work for [the defendant]. . . . The entire project was marked by [the defendant]'s indifference to the manner in which work orders were given to the plaintiff; indeed, [the defendant] did not even know what all of those orders

were. [The defendant]'s messages to the plaintiff focused almost exclusively on the work to be done and the speed with which it could be done. [The defendant] seldom inquired as to the expense involved. His disinterest in managing the project costs causes the court to reject his claim that charges beyond the amount he chose to pay were unwarranted. . . .

"[The defendant] unilaterally and arbitrarily selected a price that he was willing to pay for the project. He had agreed to a time and materials contract, but eventually decided, without a sound factual basis, that he would not pay for all of the time and materials expended on the project. Thereafter, having decided to make no further payments after August 4, 2008, [the defendant] enticed the plaintiff into continuing to do work for him, using a 'carrot and stick' approach. After the last payment was made on August 4, 2008, [the defendant]'s actions suggested to the plaintiff that perhaps [the defendant] could be convinced that the additional charges were valid. For many weeks after making the August 4, 2008 payment, [the defendant] attempted to convince the plaintiff to complete the punch list, which consisted of more than one hundred items. At the same time that [the defendant] was encouraging the plaintiff to go on working for him, [the defendant] was concomitantly suggesting to the plaintiff that if the plaintiff was contemplating legal action to recover the moneys he was claiming, [the defendant] would represent himself, thus signaling that there would be no expense to [the defendant] in defending or bringing a lawsuit, yet implicitly reminding the plaintiff that he, unlike [the defendant], would have to bear the expense associated with retaining counsel to obtain redress. [The defendant] knew, from his communications with the plaintiff, that the plaintiff was in difficult economic straits at that point.

"When viewed in light of all the circumstances, the court concludes that [the defendant]'s approach constituted a design to mislead and/or deceive the plaintiff. Further, [the defendant]'s decision to continue to encourage the plaintiff to work for him after August 4, 2008, knowing that [the defendant] would not be making any further payments to the plaintiff, constituted a neglect and/or a refusal to fulfill [the defendant]'s contractual obligations to the plaintiff.

"The court, having had ample opportunity to observe the conduct, demeanor and attitude of the witnesses, to evaluate the testimony and to relate the testimony of each witness to the exhibits in the case, concludes that [the defendant]'s decision to make no further payments after August 4, 2008, was not prompted by an honest mistake as to his rights or duties. Instead, this decision was the product of [the defendant]'s desire to use the plaintiff to finish the project at no further expense to [the defendant]. The latter approach was

faster, more efficient and vastly more economical than concluding the relationship with the plaintiff and retaining a new contractor. Thus, it was a course of conduct that was the product of [the defendant] choosing to serve his own financial interests at the plaintiff's expense. Indeed, the latter conclusion is something of an understatement considering the fact that [the defendant]'s course of action served to put the plaintiff out of business. . . .

"[The defendant] was not honest with the plaintiff when [he] suggested, after August 4, 2008, that he might make the additional payments that the plaintiff needed to pay his subcontractors and materials suppliers. The plaintiff has met his burden of establishing bad faith by [the defendant]." (Citations omitted; footnote omitted.) The court thereby rejected the defendant's special defenses and counterclaim based upon alleged noncompliance with the act.[5]

Turning to the issue of damages, the court made the following additional findings: "The plaintiff presented credible evidence, which the court does credit, indicating that the value of the plaintiff's work on the project, the value of the work of the crew members and subcontractors who worked under his supervision, and the cost of materials and associated expenses exceeds, not only the $985,000 paid by the [defendant], but also the $214,039 in damages claimed in the complaint. However, since the plaintiff's damage recovery is limited to the allegations in his complaint, the court awards the plaintiff $214,039.09 in damages, as alleged in count two of the complaint."[6] (Footnote omitted.) The court found that Weitzman was not liable to the plaintiff because she was not a party to the contract, and thus any damages were recoverable only as to the defendant.

TRIAL COURT'S FACTUAL FINDINGS AND LEGAL
CONCLUSIONS WITH RESPECT TO PLAINTIFF'S
REQUEST FOR ATTORNEY'S FEES IN
CONNECTION WITH HIS
FORECLOSURE OF
MECHANIC'S LIEN
ON DEFENDANT'S
HOME

On April 12, 2012, the plaintiff moved for a supplemental judgment on the first count of his complaint, in which he sought to foreclose on the mechanic's lien he had filed on the defendant's property, as well as to recover attorney's fees pursuant to § 52-249 (a) and postjudgment interest pursuant to General Statutes § 37-3a. On June 22, 2012, the parties entered into a stipulation that partially resolved the issues presented by the motion for a supplemental judgment. As the court outlined in its August 20, 2012 memorandum of decision on that motion: "The parties also stipulated, relative to the mechanic's lien, that a judgment may enter in favor of the plaintiff on the first count of the

revised complaint. The stipulated terms of the foregoing judgment are: (a) that the plaintiff is owed a debt in the amount of $214,039.09; (b) that the fair market value of [the defendant's] interest in the property that is the subject of the lien is in excess of $500,000; (c) that the court shall enter a judgment of strict foreclosure, with law days to commence August 14, 2012; (d) that the plaintiff is entitled to a title search fee in the amount of $225; (e) that the plaintiff is not entitled to an appraisal fee; and (f) that the issue of the plaintiff's right to attorney's fees on the first count is left for the court to resolve.

"The June 22, 2012 stipulation further provides that the parties agree that the plaintiff, if he ultimately prevails in the appeal, will be entitled to postjudgment interest from April 2, 2012, at the rate of 4.5 percent per annum on any judgment ultimately found to be due and payable by [the defendant]."

The only remaining issue for the court's resolution was whether the plaintiff was entitled to attorney's fees pursuant to § 52-249 (a). On that issue, the court concluded as follows: "General Statutes § 52-249 (a) plainly and unambiguously requires a hearing on a mechanic's lien as a necessary precedent to an award of attorney's fees. Moreover, reading the statute as requiring such a hearing does not yield either absurd or unworkable results. On the contrary, the foregoing interpretation of the statute creates an incentive for parties, especially defendants, to resolve issues pertaining to, e.g., mechanic's liens, without a hearing. Consequently, since there was no hearing in this case, General Statutes § 52-249 (a) precludes an award of attorney's fees in this case."

These two appeals followed. In AC 34565, the defendant claims that the trial court improperly rendered judgment in favor of the plaintiff under the bad faith exception to the act. In AC 35005, the plaintiff claims that the court improperly denied his request for attorney's fees in connection with the foreclosure of his mechanic's lien on the defendant's property pursuant to § 52-249 (a). We address each appeal in turn.

I

AC 34565

In this appeal, the defendant challenges the trial court's judgment awarding restitution to the plaintiff under the bad faith exception to the act for the unpaid work he performed on the defendant's home under a home improvement contract that did not comply with the mandatory requirements of the act. Specifically, the defendant makes the following claims of error. First, he contends that the bad faith exception was abrogated by the passage of No. 93-215 of the 1993 Public Acts (P.A. 93-215), which amended the act shortly after the exception was first recognized and applied without cod-

ifying the exception into the act's provisions. Second, he claims that even if the exception was not so abrogated, it has never been applied where, as here, the homeowner's alleged bad faith conduct neither preceded, and thereby caused, the contractor's performance of the work for which he seeks restitution nor involved the homeowner's acceptance of such work with knowledge of the contract's noncompliance with the act, and resulting unenforceability for the dishonest purpose of not paying for such work by later invoking the act. Third, the defendant claims that even if the bad faith exception can be invoked on the basis of bad faith conduct not involving the knowing acceptance of work under an unenforceable contract in order to avoid paying for such work, the defendant's proven conduct was not marked by bad faith, for it involved only an honest, good faith dispute about the nature and quality of the contractor's work. We reject the defendant's claims for the following reasons.

### A

As for the defendant's claim that the bad faith exception to the act was abrogated by the passage of P.A. 93-215, the parties understand and agree that we are bound to reject that claim under the authority of *Walpole Woodworkers, Inc.* v. *Manning*, 126 Conn. App. 94, 105, 11 A.3d 165 (2011), aff'd, 307 Conn. 582, 57 A.3d 730 (2012), in which another panel of this court rejected that claim. We will be bound by our holding in *Walpole Woodworkers, Inc.*, until it is overruled either by our Supreme Court or by an en banc panel of this court. The defendant has raised the claim before us solely to preserve it for later Supreme Court review. Accordingly, we will not address it further at this time.

### B

The defendant next claims that the court erred in awarding the plaintiff damages under the bad faith exception to the act because his dispute with the plaintiff arose before he knew of the act or its requirements and after the plaintiff had performed all of the work for which he now seeks restitution. By this argument, the defendant suggests that the only situation in which a homeowner can be found to have invoked the act in bad faith to defeat a contractor's claim for payment for work performed without an act-compliant contract is when he does so to avoid paying for services he accepted with knowledge of the act and its requirements and the intent not to pay for them by later invoking the act. If, by his logic, his billing dispute with the contractor arose before he knew of the act or its requirements, when he was unaware of the contract's noncompliance with the act or its resulting unenforceability, his later invocation of the act to defeat the contractor's claim for payment cannot be found either to have been made in bad faith or to have caused the contractor any losses for which he is entitled to restitu-

tion. We disagree.

Our Supreme Court has declared that the act "is a remedial statute that was enacted for the purpose of providing the public with a form of consumer protection against unscrupulous home improvement contractors. . . . The aim of the statute is to promote understanding on the part of consumers with respect to the terms of home improvement contracts and their right to cancel such contracts so as to allow them to make informed decisions when purchasing home improvement services. . . . Therefore, to advance this purpose, the act provides that a home improvement contract is not enforceable against a homeowner, either by way of an action for breach of contract or for unjust enrichment, unless the contract complies with the mandatory writing requirements of General Statutes § 20-429 (a). . . .

"Although the act generally prohibits a plaintiff from pursuing a claim for unjust enrichment on a home improvement contract if the act's requirements are not satisfied, proof of bad faith on the part of the homeowner is an exception to this restriction. . . . The bad faith exception precludes the homeowner from hiding behind the protection of the act. . . . The central element giving rise to this exception is the recognition that to allow the homeowner who acted in bad faith to repudiate the contract and hide behind the act would be to allow him to benefit from his own wrong, and indeed encourage him to act thusly. . . . It is the burden of the party asserting the lack of good faith to establish its existence . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Andy's Oil Service, Inc.* v. *Hobbs*, 125 Conn. App. 708, 714–15, 9 A.3d 433 (2010), cert. denied, 300 Conn. 928, 16 A.3d 703 (2011).[7]

Our Supreme Court first applied the bad faith exception to the act in *Habetz* v. *Condon*, 224 Conn. 231, 618 A.2d 501 (1992), where it affirmed the trial court's rejection of a homeowner's special defense to a contractor's claim for payment based upon the contractor's noncompliance with the act in light of the homeowner's bad faith in invoking the act to repudiate the contract. In *Habetz*, the parties initially entered into a signed, written contract, under which the contractor agreed to construct a two-story addition to the homeowner's home for an agreed upon price. Thereafter, however, when the homeowner asked and the contractor agreed to perform certain extra work not specified in the original contract, the contractor performed the work as requested, although the homeowner never signed the written proposal for its performance despite repeated requests by the contractor that he do so. Id., 233. After all of the extra work was performed, the homeowner refused to pay the contractor either for such extra work or for all of the work he had previously performed under the parties' original contract. Instead, the homeowner

brought an action against the contractor to recover damages for alleged negligence in performing his work, breach of contract on the basis of such allegedly negligent performance, and alleged violation of CUTPA in rendering such performance. Id., 234. The contractor denied all of the homeowner's claims of wrongdoing against him and filed a two count counterclaim, alleging that the homeowner had wrongfully refused to pay him either the $10,000 balance due to him for work he had performed under the original contract and any of the money he had agreed to pay for the extra work he later performed without a signed, written contract. Id. The trial court ruled for the homeowner on his claim of breach of contract because the noncompliant contract was not enforceable under the act. Even so, it awarded damages to the contractor under both counts of his counterclaim on the basis of the homeowner's bad faith repudiation of his obligations to the contractor under both the signed and the unsigned contracts. The trial court determined that the homeowner had repudiated his obligations to the contractor in bad faith because, as the Supreme Court later summarized in affirming its judgment, "evidence of bad faith permeated the dealings between the parties and thus related to work performed pursuant to the original contract as well as to the list of extras." Id., 235 n.8.

In reaching this conclusion, the court rejected the homeowner's argument that the bad faith exception, the availability of which had been theorized in earlier cases, was an ill-considered loophole that should be closed to ensure that the act was strictly enforced to protect innocent homeowners from unscrupulous contractors. The court disagreed, explaining the protective purpose of the exception as follows: "A bad faith exception is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to demands of justice and good conscience. The law does not permit the exercise of a right to repudiate a contract when the exercise of such a right in bad faith would work an injustice. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . To demand this implicit component but do nothing about its absence would be at best incongruous, and, more accurately, grossly unfair. Thus, a contractor, otherwise precluded from recovering moneys owed for his work because of a violation of the act, must be permitted to assert that the homeowner's bad faith precludes him from safely repudiating the contract and hiding behind the act in order to bar the contractor's recovery." (Citations omitted.) Id., 238. "The question is not whether the legislature specifically carved out this bad faith exception . . . but whether, in the absence of specific legislative indication otherwise, a doctrine founded on public policy and con-

taining a strong strain of estoppel can prevent a misbehaving party from invoking the benefits of a statute which is absolute on its face. To deny the contractor any opportunity of recovery after he has completed his end of the bargain if he has persuaded the trier of fact that a statutory remedy is being invoked by a homeowner in bad faith would be to countenance a gross injustice and indeed to encourage its perpetuation and to assure its success." Id., 240.

By these words, the court in *Habetz* identified the purpose of the exception in broad terms. It clarified that the exception could be invoked whenever a contractor's noncompliance with the act was raised by a homeowner as a basis for effecting an unwarranted repudiation of a substantially completed contract, and thereby perpetrating an injustice upon a contractor who had performed his work with the legitimate expectation of being paid, albeit under a noncompliant and thus unenforceable contract.

Notwithstanding the breadth of the exception's purpose, as explained by the Supreme Court in *Habetz*, the defendant argues that its true scope is more narrow for two related reasons. First, because the exception is said to have "a strong strain of estoppel," he claims that a homeowner's bad faith conduct cannot fall within the exception unless it misled, and thereby caused, the contractor to perform the work for which he seeks restitution without an act-compliant contract. He argues that because the exception must be based upon the homeowner's bad faith invocation of the act to defeat a contractor's claim for payment, such bad faith must involve relying upon the act to avoid paying for services which the homeowner accepted under a contract which he knew to be unenforceable. He claims here that he could not have engaged in bad faith in invoking the act to defeat the plaintiff's claim for restitution because there he did not know of the act or its requirements until mid-September, 2008, when he first consulted with an attorney after the plaintiff's work under the noncompliant contract was substantially completed and his billing dispute with the plaintiff arose.

In support of that two-pronged argument, the defendant relies on our Supreme Court's decision in *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 249, 618 A.2d 506 (1992), in which the bad faith exception was expressly invoked on a similar basis. In *Wadia Enterprises, Inc.*, our Supreme Court considered a contractor's claim of bad faith against the defendant homeowners in an action by the contractor to foreclose on a mechanic's lien he had filed on the defendants' property after performing work on the property without an act-compliant contract. As evidence of the homeowners' bad faith, the contractor alleged that the homeowners had "prepared the underlying defective contract

through their New York attorneys and architect and then relied on the same contract as a defense to its enforcement . . . ." Id., 248. In rejecting the plaintiff's claim of bad faith, the court held that "[t]he fact that the defendants had their architect and New York attorneys draft the contract does not in and of itself indicate bad faith on the part of the defendants. There is no allegation or proof that the attorneys intentionally omitted [the] requirement [that the contract contain notice of the right of cancellation] in order to have an escape hatch. At most, the New York attorneys were negligent in failing to consult Connecticut law and to include the required clause in the contract. An honest mistake does not rise to the level of bad faith." Id., 248–49. The court further explained that "[t]here is nothing dishonest or sinister about homeowners proceeding on the assumption that there is a valid contract, enforcing its provisions, and later, in defense to a suit by the contractor, upon learning that the contract is invalid, then exercising their right to repudiate it." Id., 249; see also *Lucien* v. *McCormick Construction, LLC*, 122 Conn. App. 295, 998 A.2d 250 (2010).

In so ruling, the court in *Wadia Enterprises, Inc.*, did not purport to limit the bad faith exception to bad faith conduct involving the knowing formation of or acceptance of services under a noncompliant home improvement contract, with the intent not to pay for those services by later invoking the act to repudiate the contract. Instead, although it limited its discussion to such a claim of bad faith, which was the only claim at issue in the case before it, its holding was merely that an essential element of any bad faith claim is that the homeowner acted with a dishonest or sinister motive when he invoked the act to repudiate the contract.

The holding in *Wadia Enterprises, Inc.*, is therefore consistent with the principles underlying the bad faith exception, as articulated in *Habetz*, which was decided on the same day as *Wadia Enterprises, Inc.* The language used in *Habetz* to describe the purpose of the exception—to "prevent a misbehaving party from invoking the benefits of a statute which is absolute on its face"; *Habetz* v. *Condon*, supra, 224 Conn. 240; by disallowing "a homeowner who acted in bad faith to repudiate the contract and hide behind the act"; id., 237;—clearly contemplates that a homeowner might be found to have invoked the act in bad faith if he did so to cover up and achieve the illicit objectives of other dishonest dealings between himself and the contractor, regardless of whether he knew of the act and its requirements at the time of those other dishonest dealings, or intended at the outset of those dealings to invoke the act to achieve his dishonest purpose. The act can no more serve as a convenient, if previously unplanned, vehicle for carrying out a homeowner's independent scheme to deprive a contractor of the benefit of his

bargain than, as the contractor claimed but failed to prove in *Wadia Enterprises, Inc.*, as the long-planned device for executing such a dishonest scheme. With that broad conception of bad faith in mind, the court in *Habetz* focused its attention not on the homeowner's knowledge of the act or its requirements when he accepted services under the noncompliant contract there at issue, but on the entire course of dealings between the parties, which it found to be permeated by bad faith. Those dealings included both the homeowner's ultimate failure to honor his contractual obligations to make payments under the parties' original act-compliant contract, as well as his agreement for the performance of extra work under a proposal he never signed despite the contractor's repeated requests that he do so.

In the twenty-plus years since *Habetz* and *Wadia Enterprises, Inc.*, were decided, this court and our Supreme Court have frequently had occasion to rule on claims for restitution under the bad faith exception. In only one of those cases did this court suggest that the exception might be limited to "instances of bad faith relating to the formation of, or inducement to, enter into a home improvement contract." *Dinnis* v. *Roberts*, 35 Conn. App. 253, 259, 644 A.2d 971, cert. denied, 231 Conn. 924, 648 A.2d 162 (1994). In several other cases, however, no such limitation on the scope of the exception has been imposed, and thus bad faith has been found to arise in settings other than the formation or acceptance of services under a noncompliant contract with knowledge of its unenforceability. Under those authorities, particularly this court's recent application of the exception in *Walpole Woodworkers, Inc.* v. *Manning*, supra, 126 Conn. App. 94, we must reject the defendant's claim.

In *Walpole Woodworkers, Inc.*, a trial court's finding of bad faith was affirmed, as was the bad faith finding in *Habetz* before it, without any consideration of the homeowner's knowledge of the requirements of the act when he agreed with the contractor to have work performed at his home without an act-compliant home improvement contract. In *Walpole Woodworkers, Inc.*, the contractor was retained to install a fence around the homeowner's yard. After the work was substantially completed, the homeowner delayed his final payment. Id., 101. When pressed about his reasons for delay, the homeowner expressed concern that his small dog might be able to escape under the fence. The contractor responded by offering the homeowner a "free fix" for the previously undisclosed problem, but the homeowner delayed the contractor's installation of the "free fix" for six months because the parties could not agree either when to install it or whether, upon its installation, the contractor would be paid for his work. After the "free fix" was finally installed, the homeowner persisted in his refusal to pay the balance due under the contract

even though his only stated concern regarding the quality and sufficiency of contractor's work had been fully remedied. The homeowner "testified at trial that [once] the fence work was [completed, he] simply decided he would not pay the balance due on the contract." Id., 101–102. In those circumstances, the trial court found, and this court later agreed, that the homeowner had acted in bad faith by invoking the act as a means of not paying for the work he had engaged the contractor to perform. Id., 102.

This court's holding in *Walpole Woodworkers, Inc.*, reinforces the general principle underlying the bad faith exception, as explained in *Habetz* and applied in *Wadia Enterprises, Inc.* Those cases make it clear that the bad faith exception is not circumscribed by the timing of the alleged bad faith conduct of a homeowner who later seeks to avoid his contractual obligations by invoking the contractor's alleged noncompliance with the act. We therefore reject the defendant's claim that the bad faith exception cannot apply in the circumstances of this case without evidence that he knew of the act and its requirements before receiving the services for which the plaintiff seeks restitution. Any invocation of the act to avoid a contractual obligation to the contractor for a dishonest or sinister purpose can serve as a proper basis for seeking restitution under the bad faith exception, and thereby preventing an injustice.

C

The defendant finally argues that the court erred in awarding damages under the bad faith exception because the present allegations of bad faith involved nothing more than the refusal to pay disputed charges allegedly due and owing under a contract. We disagree.

The court in *Habetz* made it clear that a homeowner's mere disagreement with a contractor about the quality or completeness of his work is insufficient to establish bad faith. Consistent with its precedent, the court defined bad faith as involving "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *Habetz* v. *Condon*, supra, 224 Conn. 237. "It is the burden of the party asserting the lack of good faith to establish its existence and whether that burden has been satisfied in a particular case is a question of fact." Id., 238 n.11.

In reviewing the trial court's finding of bad faith in this case, we are mindful that "[q]uestions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Murtha* v. *Hartford*, 303 Conn. 1, 12–13, 35 A.3d 177 (2011). "[O]ur function as an appellate court is to review and not retry the proceeding of the trial court." (Internal quotation marks omitted.) *Foley* v. *Foley*, 140 Conn. App. 490, 492, 58 A.3d 977 (2013).

"[T]he trial court, as trier of fact, determine[s] who and what to believe and the weight to be accorded the evidence. The sifting and weighing of evidence is peculiarly the function of the trier. [N]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded to their testimony. . . . We have constantly held to the rule that we will not judge the credibility of witnesses or substitute our judgment for that of the trial court." (Internal quotation marks omitted.) *Vance* v. *Tassmer*, 128 Conn. App. 101, 116, 16 A.3d 782 (2011). "[W]e must resist the temptation to reweigh the testimony of witnesses we have neither seen nor heard, draw inferences the court has rejected or substitute our judgment for that of the trial judge, who was closest to the evidence and was in the best position to evaluate it." *In re Davonta V.*, 98 Conn. App. 42, 55, 907 A.2d 126 (2006), aff'd, 285 Conn. 483, 940 A.2d 733 (2008). In other words, "[w]e must be ever mindful . . . [on review that] . . . [t]he question is not whether this court might have reached the same conclusion [as the trial court] . . . but whether the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *In re Tyqwane V.*, 85 Conn. App. 528, 541, 857 A.2d 963 (2004). "We do not substitute our judgment for that of the trial court simply because we might have concluded otherwise on the evidence." *Albuquerque* v. *Albuquerque*, 42 Conn. App. 284, 288–89, 679 A.2d 962 (1996).

Although the defendant argues that the alleged bad faith in this case involved nothing more than a homeowner's refusal to pay disputed charges arising from a contract dispute, the trial court disagreed. Instead, it likened the defendant's conduct to that of the homeowner in *Walpole Woodworkers, Inc.*, in determining that such conduct was engaged in in bad faith. The trial court here found, and the record confirms, that the renovation project on the defendant's home was largely completed by the time the defendant decided that he had paid the plaintiff enough for the work done on his

home and refused to pay the plaintiff any more. The court found that the defendant's refusal to pay the plaintiff was motivated by the fact that the defendant had already received the bulk of the benefits he expected from his relationship with the plaintiff, and thus that there was little risk to him if he refused to pay. The court found that although the defendant had agreed to a time and materials contract, he "unilaterally and arbitrarily selected a price that he was willing to pay for the project" without a "sound factual basis." He then employed a " 'carrot and stick' " approach to entice the plaintiff to continue to do work on the project, suggesting that he might be convinced to pay the plaintiff more, even though he never actually intended to do so. The court found that the defendant's conduct in asking the plaintiff to continue working on the project, knowing that he would not be paying the plaintiff for that work, "constituted . . . neglect and/or a refusal to fulfill [his] contractual obligations to the plaintiff." The court concluded, based upon its observation of the conduct, demeanor and attitude of the witnesses—all factors that trial courts are particularly well-suited to assess—that "[the defendant]'s decision to make no further payments after August 4, 2008, was not prompted by an honest mistake as to his rights or duties. . . . [Rather], this decision was the product of [the defendant]'s desire to use the plaintiff to finish the project at no further expense to [the defendant, which] was faster, more efficient and vastly more economical than concluding the relationship with the plaintiff and retaining a new contractor. Thus, it was a course of conduct that was the product of [himself] choosing to serve his own financial interests at the plaintiff's expense." The court concluded that the defendant's inducement of the plaintiff to continue working on his home on the pretense that he might pay him more, all the while not intending to do so, and his subsequent invocation of the act was made in bad faith.[8] The conduct found to have been engaged in in bad faith here, as in *Walpole Woodworkers*, *Inc.*, and *Habetz*, was a self-serving attempt by the homeowner to receive the benefit of a bargain for which he had freely contracted without fulfilling his own duty to pay for that benefit. He tried to avoid his obligation by hiding behind the protection of the act, which was not established for that purpose. The bad faith exception to the act has been recognized and enforced to discourage this very conduct.

All of the foregoing factual findings, and the inferences drawn from them, are well supported by the record. Indeed, the defendant has not argued that the court's findings are not so supported. Essentially, the defendant is asking us to retry the facts. This we are unable to do. *Hopfer* v. *Hopfer*, 59 Conn. App. 452, 458, 757 A.2d 673 (2000). The trial court stated the rationale for its findings and reasonably reached its conclusions

from the evidence presented. The court further indicated that credibility determinations greatly influenced its findings, and such determinations are generally beyond the permissible scope of our review. We must be careful not to substitute our judgment for that of the trial court. It cannot be said that the trial court's ruling in this case was unreasonable. See *State* v. *Askew*, 245 Conn. 351, 374, 716 A.2d 36 (1998) (*McDonald, J.*, dissenting). We therefore conclude that the court did not err in rendering judgment in favor of the plaintiff under the bad faith exception to the act.

## II

## AC 35005

In this related appeal, the plaintiff claims that the trial court improperly denied his request for attorney's fees even though he successfully obtained a judgment of foreclosure on his mechanic's lien. The plaintiff argues that the court erred in determining that he was not entitled to attorney's fees pursuant to § 52-249 (a) because the statute allows for attorney's fees only when there is a hearing on the mechanic's lien, but there was no hearing here. The plaintiff argues that the court erroneously determined that the first count of his complaint seeking foreclosure of the mechanic's lien had been bifurcated from the other two counts of his complaint prior to trial. He contends that when he tried his other two claims, the contract and unjust enrichment claims, he also undertook to establish the elements necessary for the foreclosure of the mechanic's lien and thus that the trial on those two counts constituted the "hearing" contemplated in § 52-249 (a). We disagree.

"Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to [the broader statutory scheme]. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *State* v. *Pond*, 315 Conn. 451, 466–67, 108 A.3d

1083 (2015).

Section 52-249 (a) provides in relevant part: "The plaintiff in any action of foreclosure of a mortgage or lien, upon obtaining judgment of foreclosure, when there has been a hearing as to the form of judgment or the limitation of time for redemption, shall be allowed the same costs, including a reasonable attorney's fee, as if there had been a hearing on an issue of fact. . . ."

As noted, prior to the commencement of trial in this action, the parties agreed that trial on the first count of the plaintiff's complaint, the count seeking foreclosure of his mechanic's lien on the defendant's property, would be bifurcated from the trial on his breach of contract and unjust enrichment counts. The court acquiesced and the case proceeded accordingly. After the court issued its memorandum of decision ruling in favor of the plaintiff under the bad faith exception to the act, the plaintiff moved for a supplemental judgment seeking foreclosure of the mechanic's lien. The parties thereafter stipulated that there would not be a hearing on the terms of the judgment of foreclosure of the mechanic's lien. Accordingly, the stipulation was submitted to, and approved by, the court without a hearing. The trial court concluded, based upon the plain language of § 52-249 (a), that the condition precedent to the awarding of attorney's fees, namely, a hearing, had not been satisfied. The court thus denied the plaintiff's request for attorney's fees.

The plaintiff's claim that his foreclosure claim was not bifurcated from his other two claims is belied by the record, in which both parties expressly sought bifurcation. We cannot disagree with the plaintiff that, in establishing the liability of the defendant and the amount of the debt due to him in in his contract claim, he also established the essential elements of his foreclosure claim. We agree with the trial court, however, that § 52-249 (a), by its plain language, "contemplates a hearing with regard to specific aspects of the foreclosure proceeding." The parties' stipulation on the supplemental judgment obviated the need for such a hearing. Neither party asked for such a hearing. Because trial on the foreclosure claim was bifurcated from the trial on the plaintiff's other claims, and thus was not pursued at the trial on the latter claims, that trial cannot reasonably be considered the "hearing as to the form of judgment or the limitation of time for redemption" contemplated by § 52-249 (a). Because no such hearing took place here, the trial court properly denied the plaintiff's request for attorney's fees pursuant to § 52-249 (a).[9]

The judgments are affirmed and the case is remanded for the purpose of setting new law days.

In this opinion the other judges concurred.

[1] Although Adler's wife, Amie R. Weitzman, and the Salisbury Bank and Trust Company were also defendants in the underlying action, they are not

parties to these appeals. Therefore, in referring to the defendant, we refer solely to Adler.

[2] This difficulty was accentuated by the plaintiff's clear understanding from the defendant that he was to follow each of the defendant's directions to the letter as to work to be performed on the project. To illustrate this point, the court took special note, as follows, of the "single occasion" on which the plaintiff admittedly disregarded the defendant's directions: "The plans called for the exterior to be covered with a product known as Tyvek, followed by a rain-repellant covering known as Home Slicker, and those products were both to be covered with shingles. The plaintiff testified that, instead, he used a product called Typar, which, he said, was an equivalent product to the Tyvek/Home Slicker combination but which cost less than the latter products. The architect complained to the [defendant] when she discovered this substitution. [The defendant] discussed the issue with the plaintiff, and told him that he would accept the Typar product, but [the defendant] also told the plaintiff never to disregard instructions in the future."

[3] General Statutes § 20-429 (a) provides in relevant part: "No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor and the contractor's registration number, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740, (7) contains a starting date and completion date, (8) is entered into by a registered salesman or registered contractor, and (9) includes a provision disclosing each corporation, limited liability company, partnership, sole proprietorship or other legal entity, which is or has been a home improvement contractor pursuant to the provisions of this chapter or a new home construction contractor pursuant to the provisions of chapter 399a, in which the owner or owners of the home improvement contractor are or have been a shareholder, member, partner, or owner during the previous five years. . . ."

The court determined that the plaintiff had failed to comply with the act because the contract did not contain a completion date, he did not sign the contract, and he did not deliver an executed copy of the contract to the defendant. It is noteworthy that the court found that "the [defendant] waived [his] right to rely on the written and signed change order requirement [of the act] by repeatedly giving the plaintiff new orders and job requests, many of which appear to have been spontaneous decisions unilaterally made by the [defendant] and conveyed to the plaintiff by, in many cases, hurried and offhand e-mail instruction. There is no significant evidence that the [defendant] protested when the plaintiff carried out [his] oral and/or e-mailed project tasks despite the absence of a written change order signed by both parties."

[4] The trial court listed as follows a "representative sample" of such cascading work orders following the defendant's mid-March, 2008 inquiry as to total project cost:

"1. March 27, 2008. Weiner inquired regarding the specifications for under-shelf lighting. . . .

"2. March 27, 2008. Weiner sent drawings for bathroom hardware locations, noting that hardware specifications would follow. . . .

"3. April 1, 2008. [The defendant] advised the plaintiff that [he] was sending one thousand feet of speaker wire to be delivered the following day so that audio speakers could be installed in multiple locations throughout the house. . . .

"4. April 4, 2008. [The architect] inquired as to whether the plaintiff would be repairing a foundation wall. . . .

"5. April 6, 2008. [The defendant] sent the plaintiff specifications for the installation of a range hood. . . .

"6. April 10, 2008. [The defendant] inquired as to how quickly the kitchen cabinets would be installed because that had to be done before templates for the countertops could be created, and also provided specifications for an under counter wine storage refrigerator. . . .

"7. April 14-15, 2008. [The defendant] and the plaintiff exchanged messages about numerous aspects of work on the project, including [the defendant]'s plan to install a 'plasma' on the wall in the 'xbox' room. . . .

"8. April 16, 2008. Weitzman advised the plaintiff that instead of marble for the fireplaces, she had decided that she wanted to use a stone called 'pietra cardoza.' " (Citations omitted.)

[5] The defendant filed six special defenses. In his first and second special defenses, he asserted, respectively, that the plaintiff should be denied recovery because he (1) failed to mitigate his damages and (2) had unclean hands. In his remaining special defenses, he asserted that the plaintiff was statutorily barred from recovering damages for breach of contract or unjust enrichment because he had performed the work for which he sought to recover damages in violation of several provisions of the act, particularly, by (3) failing to procure a written contract that contained the entire agreement between the owner and the contractor; (4) failing to put change orders in writing; (5) failing to ensure that the written contract contained both a start date and a completion date, and that it was signed by both parties; and (6) failing to provide the defendant with a completed copy of the contract at the time the contract was executed.

The defendant also filed a four count counterclaim, in which he alleged that the plaintiff: (1) violated CUTPA; (2) was negligent in performing work on the subject property; (3) breached an oral contract that he had with the defendant to "limit the total cost of the renovations to $886,954"; and (4) had been unjustly enriched because the defendant had paid him an amount in excess of the value of the services that he had provided to the defendant.

[6] The court found that the plaintiff proved damages in excess of the $214,039.09 sum, but that the award was capped at that amount by the plaintiff's own complaint. The plaintiff moved to amend his complaint after trial to conform to the proof that the defendant owed him $259,178.80, not the sum of $214,039.09 that he claimed in his complaint. The court denied that motion, but no challenge to that denial has been made on appeal.

[7] Our Supreme Court has explained: "In addressing cases for restitution under the act, this court has collectively referred to theories of quasi contract, quantum meruit and unjust enrichment as quasi contract claims of restitution. . . . We take this opportunity to clarify these closely related terms. Quantum meruit and unjust enrichment are noncontractual means of recovery in restitution. Quantum meruit is a theory of recovery permitting restitution in the context of an otherwise unenforceable contract. In contrast, recovery under a theory of unjust enrichment applies in the absence of a quasi-contractual relationship. . . .

"Because both doctrines are restitutionary, the same equitable considerations apply to cases under either theory. The terms of an unenforceable contract will often be the best evidence for restitution of the reasonable value of services rendered in quantum meruit, although sometimes the equities may call for a more restrictive measure. . . .

"We recognize that this court has used quantum meruit and unjust enrichment interchangeably, or as equivalent terms for recovery in restitution. . . . In addition, cases decided under the bad faith exception after *Habetz* [v. *Condon*, 224 Conn. 231, 618 A.2d 501 (1992)] have invoked both quantum meruit and unjust enrichment. . . . Nevertheless, because actions brought under the bad faith exception and § 20-249 (f) both arise from unenforceable contracts, they are best described as in quantum meruit for the reasonable value of services which were requested by the owner . . . ." (Citations omitted; internal quotation marks omitted.) *Walpole Woodworkers*, *Inc.* v. *Manning*, 307 Conn. 582, 587–88 n.9, 57 A.3d 730 (2012).

[8] It is noteworthy that the defendant's second special defense alleged unclean hands on the part of the plaintiff. The court rejected that claim, and explained: "On the contrary, the court has found that [the defendant] has engaged in bad faith in his dealings with the plaintiff, and it is, thus, [the defendant] who comes to this court with unclean hands."

[9] Moreover, to allow the plaintiff to recover attorney's fees under the mechanic's lien statute on the basis of the "hearing" on the contract and unjust enrichment claims would be contrary to the law limiting recovery under the bad faith exception to the act to the unpaid value of the work performed.